JOSHUA SCHOLEFIELD AND JOHN TAYLOR, PLAINTIFFS IN ER-
ROR v. JESSE EICHELBERGER, SURVIVING PARTNER OF JOHN
CLEMM, DEFENDANT IN ERROR.

Action of assumpsit to recover the balance of an account current for mer-
chandize purchased in England by order of the defendants. The defence
was, that the contract was made during the war, and therefore void. By
the court: the doctrine is not to be questioned at this day, that during a
state of hostility, the citizens of the hostile states are incapable of con-
tracting with each other.

To say that this rule is without exception, would be assuming too great
latitude. The question has never yet been examined whether a contract
for necessaries, or even for money to enable the individual to get home,
could not be enforced; and analogies familiar to the law, as well as the
influence of the general rule, in international law, that the severities of
war are to be diminished by all safe and practical means, might be ap-
pealed to in support of such an exception. But at present, it may be
safely affirmed that there is no recognized exception, but permission of
a state to its own citizens; which is also implied in any treaty stipulation
to that effect, entered into with a belligerent.

There is no doubt that the liability of a deceased co-partner, as well as his
interest in the profits of a concern, may, by contract, be extended beyond
his death; but without such a stipulation, even in the case of a co-partner-
ship for a term of years, it is clear that death dissolves the concern.

IN error to the circuit court of the United States for the district
of Maryland.

In the circuit court, an action of assumpsit was brought by
the plaintiffs in error for the recovery of one thousand and one
pounds four shillings and eight pence sterling, with interest;
asserted to be due to them by the defendants in error, for mer-
chandize sold and delivered. The declaration was in the
usual form.

On the trial of the cause, the plaintiffs, to maintain the issue
on their part, offered in evidence two accounts headed as fol-
lows: " Dr. Messrs Eichelberger and Clemm in account with
Scholefield, Redfern and Co."

In these accounts, the first of which commences on the 20th
of July 1813, the defendants are charged on that day, and at
subsequent dates, with sums as due for goods, postages, ex-
penses and interest; and are credited with several payments

[Scholefield v. Eichelberger.]

in 1814, 1815, 1816 and 1817: the balance stated to be due to the plaintiffs on this account, on the 1st of January 1818, appears to be two thousand five hundred and seventy-nine pounds, sixteen shillings. The second account commences January 1, 1818, and contains a credit of eight thousand dollars under date of February 14, 1819; leaving the balance of one thousand and one pounds four shillings and eight pence due on the 1st day of July 1819, the sum for which the action was instituted.

The plaintiffs proved that these accounts were delivered to the defendants for settlement some time in 1819, and that no objections were made to them, and the defendant acknowledged the balance of the accounts to be due, and promised payment of the same.

It was also in evidence, that the plaintiffs were British subjects and merchants, and had been such since the year 1807, and had always resided in England.

The defendant, to support the issue on his part, offered in evidence the correspondence of the late firm of Eichelberger and Clemm, and J. and W. Eichelberger with the plaintiffs, commencing on the 2d of February 1813, and terminating on the 20th of May 1816. The letter of 2d February 1813, from the defendants' late firm, received by the plaintiffs in error on the 17th June 1813, after stating to the plaintiffs that every thing indicated a determination on the part of the government of the United States to continue the war then existing with England, proceeds to say :

" As such a conviction may reduce the prices of your manufactures considerably, we have prepared an order (which is hereto annexed) for some articles which *are* only *to be purchased* in the event of such a reduction. You will perceive that the investment of our money in this way is an uncertain speculation, whatever may be the reduction of prices, for we can form no opinion as to the time when they can be imported into this country; and you will therefore insure the goods, when bought, against fires. So soon as we are favoured with the invoice, we will transmit a bill of exchange for the amount. This you may calculate on with certainty."

The subsequent letters of the 13th April 1813, and of the 18th June 1814, contain further orders for the purchase of

[Scholefield v. Eichelberger.]

goods; and by that of the 18th June remittances were made, and expectations of peace are expressed. "Should this desirable event take place," the defendants say, "we shall calculate on receiving the goods amongst the first that arrive, under full insurance against sea risk."

By a letter of the 22d February 1815, the firm of Eichelberger and Clemm communicated the ratification of the treaty of peace, express their expectations of uninterrupted correspondence with the plaintiffs; and they also say, " the principal object of this letter is, to confirm our former orders, and to assure you that immediate arrangements will be made to remit largely on account of them, with a full reliance that they have been executed on the most favourable terms, and with the largest discount."

On the 20th of May 1816, they communicated to the plaintiffs the losses which they have sustained, and their expectations of greater losses by the goods which had been purchased for them during the war not having been sent out in the spring of 1815, and they offer to return to the agent of the plaintiffs the packages of those goods which remain unsold. They say, in that letter, "We are anxious to make you payment;" and they ask that the plaintiffs may be satisfied with the interest on the balance due to them, as the same may be afterwards remitted on more advantageous terms than at that date, in consequence of the high rate of exchange.

The correspondence of the plaintiffs with Eichelberger and Clemm, from the 9th of August 1813 to the 13th of August 1816, was also given in evidence to show the periods in which the transactions between the parties were carried on.

The invoices of the merchandizes shipped by the plaintiffs to the defendants' late firm, were headed in the following terms :

"*Birmingham, August* 20, 1814.

" Invoice of sundry merchandizes bought of Scholefield, Redfern and Co. on account and risk of Messrs Eichelberger and Clemm, of Baltimore, marked and numbered as follows, and consigned to care of Messrs Hughes and Duncan, Liverpool."

"*Birmingham, March* 10, 1815.

" Invoice of sundry merchandize bought by Scholefield,

[Scholefield v. Eichelberger.]

Redfern and Co. on account and risk of Messrs Eichelberger and Clemm, of Baltimore, citizens of the United States of America, marked and numbered as follows, and consigned to the care of Messrs Hughes and Duncan, Liverpool."

The defendants also gave in evidence the deposition of William Eichelberger, which stated, "That sometime in the spring or summer of the year 1815, the exact period deponent does not recollect, he, this deponent, associated in the hardware business with his brother Jesse Eichelberger, who had previously conducted the same business in company with his brother-in-law, the late Mr John Clemm : That sometime in the autumn of the said year 1815, goods and merchandize arrived in the port of Baltimore from England, which goods and merchandize, this deponent entered at the custom house for Jesse and William Eichelberger : the said Jesse at the time of the arrival of the said goods being absent from the city on an excursion to the country : That the said goods and merchandize were the first that had been received since the death of Mr Clemm, and that the said goods and merchandize were entered in the books of Jesse and William Eichelberger, as their own goods, and were not at any time afterwards considered or disposed of as the goods of Eichelberger and Clemm. This deponent further saith, that all the goods and merchandize which were received subsequently to the death of Mr Clemm, were disposed of as if all the orders in relation to them had been given by Jesse and William Eichelberger, and that no part or portion of the proceeds of said goods and merchandize ever went to the credit of Eichelberger and Clemm, or to the individual estate of Mr Clemm."

The plaintiffs also gave in evidence, by John S. Skinner, that packets sailed, as cartels, between America and England frequently during the war : That cartels for a time sailed from Annapolis to Falmouth, in England—and that witness was appointed by the president of the United States to superintend the said cartels, and did superintend them from December 1812, until they ceased to run from Annapolis, which happened in about a year after the time abovementioned.

A multitude of letters on commercial subjects were sent by the said cartels—that all letters sent by them were examined

by the witness; that he never detained any letters on commercial subjects merely, but all letters of that description were suffered to go without interruption—that the practice of witness, as above stated, was known to the secretary of state, and approved by him.

Upon which evidence the defendant, by his counsel, prayed the court to instruct the jury, that upon the whole evidence, the contract upon which this action is founded, is utterly void, upon principles of public policy, and that the plaintiffs were not entitled to recover. Which instruction the court accordingly gave.

The plaintiffs excepted to the charge of the court, and prosecuted this writ of error.

The case was argued by Mr Donaldson and Mr Taney, for the plaintiffs in error; for the defendant, a printed argument was submitted to the court by Mr R. Johnson and Mr R. B. Magruder.

For the plaintiffs in error it was contended, that the contract, as set forth in the bill of exceptions, was a valid contract, on which the plaintiffs were entitled to recover; and that the court below erred in instructing the jury on the prayer of the defendant, that said contract was utterly void upon principles of public policy.

It was argued that the facts of the case do not bring the contract within the principle upon which the court charged the jury, against the plaintiffs; and which is insisted upon by the counsel for the defendants in error.

2. The intercourse between the parties was under the view and permission of the government of the United States, was not contrary to public policy, nor was it such as was inconsistent with the actual hostilities then existing between the two nations.

The rule that there shall be no trading with the enemy, is admitted; but this rule is applicable only to contracts made, and to be executed and completed during a war. While such contracts are acknowledged to be forbidden and to be void, a contract like that upon which this suit was founded partakes of no features which can bring it into censure. There was no

[Scholefield v. Eichelberger.]

intention to bring the goods into the United States until peace should be re-established: the goods were ordered to be purchased with this view and with no other, and they were to remain in England waiting that event. The expected demand for the goods on the return of peace furnished the only inducement to their purchase.

The evidence in the case shows that the first invoice, comprehending a part of the goods purchased, was paid for. The second invoice, dated March 10th, 1815, was after the war was ended, and was legal.

If the contract in the first invoice was illegal, it was closed and paid for. The debt due upon the second invoice was acknowledged after the war; and payment of it was promised.

If there was any intention to trade with the enemy, it was not carried into effect; an intention to trade with the enemy, and at the time when the trading is actually carried on, peace exists, no offence is committed. The Saunders, 2 Gallison, 210, 214. The principles of that case fully apply to the case before the court. The trading which was condemned by the court of New York in the case of Griswold v. Waddington, 16 Johns. 438, was a trading during the war. Intercourse inconsistent with actual hostility is the offence against which the operation of the rule is directed, 8 Cranch, 163.

The evidence in this case shows that commercial letters were allowed by the government to be transmitted to England. That commercial letters were transmitted under the inspection of the government agent, and this was known to, and approved by the president. This practice was known to exist by the secretary of state, and was approved. This was equivalent to a license. If certain acts are permitted, their incidents are legalized. 8 East, 273, 290; 5 Taunton, 679; Eng. Com. Law Reports, 231. A citizen of the United States may during war draw bills on the subjects of an enemy. 1 Paine, 166.

For the defendant in error it was argued, that the judgment of the circuit court should be affirmed on the following grounds.

1. The contract upon which the suit is brought, having been made at a time when Great Britain and the United States of America were at open war with each other, and the plaintiffs and defendants in this cause being then respectively citizens of

[Scholefield v. Eichelberger.]

the two belligerent nations, is utterly void on principles of public policy, acknowledged by all the civilized communities of the world. It would be a waste of time to multiply authorities for so clear a proposition. The whole subject is fully discussed in the case of Griswold v. Waddington, reported in 16 Johns. Rep. 438, and the authorities there cited by the chancellor; who, in page 472, reviews the American decisions.

2. If the orders for goods given by Eichelberger and Clemm, during the war, never afforded a ground of action for the plaintiffs against them, then it is conceived that the present suit cannot possibly be sustained. It is, in form, a suit against Jesse Eichelberger as surviving partner of John Clemm; and cannot be supported by any evidence of a *subsequent* reception of the goods, and a promise to pay by Eichelberger *after* the dissolution of the partnership by the death of Mr Clemm. The goods having been received by J. and W. Eichelberger, and a promise made to pay for them, it may possibly be true that J. and W. Eichelberger were responsible for them; but the suit should have been brought against them, and not in its present form, which supposes an ultimate liability of the representatives of Mr Clemm, who was never himself liable, and whose estate never was in point of fact benefited by the goods furnished by the plaintiffs. The attention of the court is particularly called to the form of the present action; which it is confidently conceived cannot be sustained, unless the contract, in its inception, was valid and obligatory upon Eichelberger and Clemm. There can be no relation back, from the subsequent reception of the goods, to make the estate of Clemm in any event liable. Any right of action, if existing at all, could only have sprung up from the subsequent receipt and appropriation of the goods, and this was by the new firm of J. and W. Eichelberger, and long after the dissolution of the partnership of Eichelberger and Clemm.

Mr Justice JOHNSON delivered the opinion of the Court.

The action here is assumpsit to recover the balance of an account current against Eichelberger, survivor of Eichelberger and Clemm, the latter having died during the war. The defence is, that the contract was made during war, and therefore void.

[Scholefield v. Eichelberger.]

The doctrine is not at this day to be questioned, that during a state of hostility, the citizens of the hostile states are incapable of contracting with each other.    For near twenty years this has been acknowledged as the settled doctrine of this court, and in a case which proves it to be a rule of very general and rigid application (The Rapid).    Even the exception commonly quoted of ransom bonds, has been shown, I think, in the case of Potts v. Bell, to be no exception ; since it grows out of a state of war; is, ex vi termini, a contract between belligerents; and from its nature carries with it the evidence of the fidelity of the parties to their respective governments.    To say that the rule is without exception, would be assuming too great a latitude.    The question has never yet been examined, whether a contract for necessaries, or even for money to enable the individual to get home, would not be enforced ; and analogies familiar to the law as well as the influence of the general rule in international law, that the severities of war are to be diminished by all safe and practical means, might be appealed to in support of such an exception.    But at present, it may be safely affirmed that there is no recognized exception but permission of a state to its own citizen, which is also implied in any treaty stipulation to that effect entered into by the belligerents.

Nor do the learned gentlemen who argued this cause controvert the general rule; they only attempt to except this case from its application : First, by an imputed permission on behalf of the United States-; Second, by shifting the creation of the contract from the date, which appears on its face, to the time of delivery of the goods ; which, in point of time, were not shipped until after the peace.

On the first of these grounds of exception there is a very strong case on record, to show that such a relaxation of the laws of war is not to be inferred from ordinary circumstances, if indeed it may be inferred at all; it is the case of the Count de Wohrenzoff, decided by the lords of appeal, in the year 1781. It was the case of an importation of French wines from Bourdeaux into Ireland, during the war of our revolution, and the evidence to justify it was, that the trade in wines between Dublin and Bourdeaux had been going on from the commencement of the war, openly and without interruption from the officers of the customs ; nay, that an additional duty had been imposed

upon their importation since the commencement of the war. Yet they were condemned, and their condemnation affirmed. These circumstances are infinitely stronger than those relied on in this case ; since the permit to carry on commercial correspondence during the war, cannot reasonably imply more than to sanction an innocent correspondence ; a correspondence leading only to legal results, not having for its objects any unpermitted acts, or acts inconsistent with the relation of members of hostile states.

It will be perceived here that the court does not deny the power of belligerent states, so to modify the relations of a state of war as to permit commercial intercourse or other intercourse according to their will.    They who give the law may modify it, and except from its operation whatever ground they choose to declare neutral.    The language of jurists is uniform on this subject, and reason, policy and humanity, sustain the exercise of such a power.

The second ground of exception relied on by the plaintiffs, suggests several considerations.

It is insisted, that the goods having been shipped subsequent to the war, and coming to possession of the survivor of Eichelberger and Clemm, constituted a sufficient ground of contract, without reference to the time of purchase, the delivery raising the contract for payment, and the receipt by the survivor being the receipt of the firm to which it was shipped.

1. Had the articles of copartnership, or the terms of it, if entered into without written articles, appeared upon the bill of exceptions, the court would have been called upon to consider this exception, with reference to the terms of those articles. There is no doubt that the liability of a deceased copartner, as well as his interest in the profit of a concern, may by contract be extended beyond his death ; but without such stipulation, even in case of a copartnership for a term of years, 3 Madd. 245 : it is clear that death dissolves the concern.    In the absence of proof to the contrary, we can only take this as the case of a general association, without articles extending it beyond the life of Clemm, and then the shipment having been made after his death, and no part of the proceeds having ever come to his use, the case furnishes no ground for charging his estate.

[Scholefield v. Eichelberger.]

2. But this is not the true ground on which to place this question. The consideration fatal to the claim of the plaintiffs, that the letter on which these advances were made, was in itself a nullity, and could not be made the basis of a contract, on which this court would entertain a suit; the purchases made under it could add nothing to its validity, nor were these goods ever the property of these plaintiffs, for they were purchased for these defendants, and finally shipped to them as their goods, not those of the plaintiffs. The plaintiffs advanced the money; with them the contract was for money paid and expended, but in the purchase and sale of the goods they were but the agents, carrying into effect a contract between the seller and these defendants. Hence the insurance against fire, No. 1, for the loss would have been that of defendants, not of plaintiffs.

These considerations leave no doubt upon the mind of this court, that the decision of the court below was correct.

The judgment is affirmed.


This cause came on to be heard on the transcript of the record from the circuit court of the United States for the district of Maryland, and was argued by counsel: on consideration whereof, it is ordered and adjudged by this court, that the judgment of the said circuit court in this cause be, and the same is hereby affirmed, with costs.