GEORGE W. PARKS, ADMINISTRATOR - OF SAMUEL PARKS, *v.* JOHN
ROSS.

In some of the States it is the practice, after the evidence for the plaintiff is closed,
for the defendant to pray the court to instruct the jury that there is no evidence
upon which they can find a verdict for the plaintiff.

This is equivalent to a demurrer to the evidence, and such an instruction ought to
be given whenever the evidence is not legally sufficient to serve as a foundation of
a verdict for the plaintiff.

Where the United States and the Cherokee nation agreed that the latter should emi-
grate across the Mississippi, and the former pay the expenses thereof, and the
Cherokees undertook to conduct the movement entirely by their own agents, a
person whose wagons had been hired could not hold the agent who had hired
them personally responsible. The owner of the wagons knew that the agent was
a public officer, and dealt with him as such.

Wherever a contract or engagement, made by a public officer, is connected with a
subject fairly within the scope of his authority, it shall be considered to have been
made officially and in his public character, unless the contrary appears by satis-
factory evidence of an absolute and unqualified engagement to be personally
liable.

THIS case was brought up, by writ of error, from the Circuit
Court of the United States for the District of Columbia.

It was an action brought by Parks for services rendered by
Samuel Parks to John Ross, in the removal of the Cherokee
nation to the western side of the Mississippi, in the years
1838 and 1839. The bills of exception set forth *in extenso* all
the evidence offered by the plaintiff upon the trial. Some of
this evidence consisted of long documents, which it is not
deemed necessary to insert, although they were made parts of
the bills of exceptions. Their contents will be sufficiently un-
derstood from the following narrative.

In the year 1838, the government of the United States was
desirous to remove the Cherokee nation to their assigned habi-
tation beyond the Mississippi River; and deputed General
Scott to make an arrangement with them for that purpose.
The Cherokees upon their part appointed an agent with plen-
ary powers, as appears from the following preamble to some
resolutions adopted by them in 1840: —

" And whereas, these conditions being fully settled, the
special agents of the nation, acting on the nation's behalf, after
having made divers appointments for the purpose of carrying
it into effect, in order to condense the business, did delegate its
entire superintendence to one of their body, John Ross, and by
John Ross such persons were deputed for the management of
the various departments, on account of the nation, as were
considered best qualified for the purpose," &c.

In order to ascertain the probable expense and amount of
drafts necessary to be drawn upon the Treasury, General Scott
caused the following estimate to be made out.

Estimate for the emigration of a party of one thousand Cherokees to their country west of the Mississippi, distance eight hundred miles, eighty days going: —

| | |
|---|---:|
| Fifty wagons and teams, (twenty persons to each wagon,) at a daily expense of $ 3.50, including forage, . . . . . . . . . | $ 28,000.00 |
| Returning, $ 7 each, for every twenty miles, . | 14,000.00 |
| Two hundred and fifty extra horses, forty miles each per day, . . . . . . . . | 1,000.00 |
| Ferriages, &c., . . . . . . . . . | 1,000.00 |
| Eighty thousand rations, at 16 cents each, . . | 12,800.00 |
| Conductor, $ 5 per day, . . . . . . | 400.00 |
| Assistant conductor, $ 3 per day, . . . . . | 240.00 |
| Physician, $ 5 per day, . . . . . . | 500.00 |
| Physician returning, $ 15 for every hundred miles, | 120.00 |
| Commissary, $ 2.50 per day, . . . . . | 200.00 |
| Assistant commissary, $ 2 per day, . . . | 160.00 |
| Wagon-master, $ 2.50 per day, . . . | 200.00 |
| Assistant wagon-master, $ 2 per day, . . . | 160.00 |
| Interpreter, $ 2.50 per day, . . . . .. | 200.00 |
| | $ 65,880.00 |

General Scott explained the contract in this way : —

" The understanding of the parties was common and distinct, that the eighty days allowed for the removal of each detachment, by land, was a mere assumption of a basis on which to calculate, for the moment, the advances to be made by the United States on account of the movement, and to set it agoing. If the advances proved to be too great, the excess was to be paid into the treasury of the nation ; if too little, on account of more time in the movement, the United States were to make up the difference from the trust fund."

The Cherokees were formed into thirteen detachments, and the removal commenced about the 1st of September, 1838 ; but in consequence of sickness amongst them, a drought in the country through which they had to pass, difficulties in crossing the Mississippi, and other embarrassments, the time of removal was extended to a much longer period than eighty days.

Samuel Parks was a citizen of the Cherokee nation, and John Ross hired from him four wagons and teams, to be attached to Detachment No. 11.

On the 18th of May, 1840, John Ross, styling himself " Principal Chief and superintending Agent of the Cherokee Nation for Cherokee removal," presented an account to the proper

office at Washington, claiming a balance due to the Cherokee nation of $ 581,346.88½. Amongst his vouchers was the following, being one of the expenditures incurred by Detachment No. 11, in which Parks was, with his teams : —

For hire of fifty-one wagons and teams, for 1,029 persons, from the 1st of November, 1838, to the 24th of March, 1839, inclusive, 144 days, at $ 5 per day, $ 36,720 ; allowance of 40 days for returning, at $ 7 per day each, including travelling expenses, $ 14,280, . . . . . . $ 51,000.00

In November, 1840, the Cherokees passed some resolutions, amongst which were the following : —

" Resolved, That the authority vested in the special agents, and continued by the act of union between the Eastern and Western Cherokees, passed at Illinois Camp-ground, on the 12th day of July, 1839, and by them conferred upon one of their members, John Ross, as superintendent, with a view to facilitate the duties required of them, be, and the same is hereby, approved and ratified.

" And further resolved, (in support of the aforesaid authority,) That by the Cherokee nation, through their national committee and council in national council assembled, it is hereby ordered that the aforesaid John Ross be, and he is hereby, directed and fully empowered to proceed to Washington city, and to urge a settlement of this claim with all possible expedition, and to apply for and receive from the government of the United States, in the name of the Cherokee nation, the balance due of $ 581,346.88½, as stated in the account of the emigration claim, in order that the business growing out of it may be brought to a final close."

On the 6th of September, 1841, Mr. John Bell, then Secretary of War, decided upon this claim, and allowed it, with certain deductions.

On the 17th of September, 1841, Ross received from the Treasury the sum of $ 486,939.50.

On the 13th of December, 1841, Ross settled an account with Parks as follows : —

" The Cherokee Nation to Samuel Parks, deceased,            Dr.

For the services of four wagons and teams, in the emigration of the Cherokees in Captain Richard Taylor's detachment, commencing the 1st of November, 1838, up to the 24th of March, 1839, making 144 days, at $ 5 per day each,      -      $ 2,880.00

"Cr.

By cash advanced Samuel Parks, as per receipt on
   the rolls, . . . . . . . . $ 1,600.00
     Balance due, . . . . . . $ 1,280.00

"Received of John Ross, Superintendent of Cherokee emi-
gration, one thousand two hundred and eighty dollars, in full
for the balance due of the above account.

"Signed in duplicate.

"Park Hill, Cherokee Nation, Dec. 13th, 1841.

"G. W. PARKS,
*Executor of Samuel Parks, deceased.*"

In December, 1842, the Cherokees called upon Ross for cer-
tain information, to which he replied that "he had no moneys
in his hands subject to legislation."

In July, 1844, Parks brought an action against Ross in the
Circuit Court of the United States for the District of Colum-
bia. The declaration contained the common money counts.
In March, 1848, the cause came on for trial, when the jury,
under the instructions of the court, found a verdict for the de-
fendant. Upon the trial, the defendant took two bills of ex-
ception to the admission of evidence, which were not argued
in this court in the posture of the case, and which would not
be inserted in this report, except that the plaintiff's bill of ex-
ceptions adopts them, and refers to the recapitulation of evi-
dence contained therein.

"Before the jurors aforesaid retired from the bar of the court
here, the said plaintiff, by his attorney aforesaid, filed in court
here the following bills of exceptions, to wit: —

"*Defendant's First Bill of Exceptions.*

"GEORGE W. PARKS, Administrator of SAMUEL PARKS, *v.* JOHN
ROSS.

"On the trial of this cause the plaintiff, to maintain the is-
sue on his part, offered evidence tending to show that the
plaintiff's intestate hired four wagons to be used, and the same
were in fact used, in the emigration of the Cherokee nation to
the west of the Mississippi, under the arrangement with Gen-
eral Scott, in the year 1838, and produced and read to the jury
the account and receipt of the plaintiff, as follows (copied in
pages 364, 365); and also offered to read in evidence the account
presented by the defendant to the government of the United
States, as follows (copied in page 364); with account of De-
tachment No. 11, in which detachment it was admitted the

31 *

said wagons were employed, and were part of the fifty-one wagons therein mentioned; and also the opinion and decision of Mr. John Bell, Secretary of War, thereon; and the preamble and resolutions of the Cherokee nation referred to therein (copied in page 364); and the requisition of the War Department; and the warrant on the Treasury; and the receipt of the defendant; to all which offered evidence the defendant, by his counsel, objects; but the court overruled the said objection, and permitted the same to be read; and the defendant, by his counsel, excepts thereto, and prays the court to sign and seal, and cause to be enrolled, this his first bill of exceptions, which is done accordingly, this 10th day of April, 1848.

" W. Cranch,

Jas. S. Morsell."

### *Defendant's Second Bill of Exceptions.*

" George W. Parks, Administrator of Samuel Parks, *v.* John Ross.

### " *Richard Taylor's Testimony.*

" On the further trial of this cause, and after the evidence contained in the foregoing bill of exceptions made part hereof, the plaintiff, further to maintain the issue on his part joined, gave evidence to show and prove, by Richard Taylor, (the said evidence being noted in writing by the defendant's attorney,) that he is a Cherokee, and was one of the delegates originally appointed by that nation to enter into an arrangement with the United States for the transportation and emigration of the said Cherokee nation to the country set apart for them west of Mississippi River; that he had charge of the business of generally superintending the wagons of one detachment, in which the wagons of the plaintiff's intestate were employed; that shortly after they arrived in the Cherokee country he was paid off by John Ross, and the accounts of all those whose wagons had been employed were settled and adjusted by the committee or delegates, and they were paid for eighty days' travel, and the balance was left unpaid till the money could be received from the United States; the committee or delegates of the emigration were all present with Ross; they were appointed by the nation in council, before they started for the West, and never delegated their whole power to John Ross, but always acted when they were needed. John Ross had a general order and power to pay the claims arising out of the emigration; he received the money and paid it out. Several years ago he paid over to the Cherokeee nation $ 125,000,

which had been saved from the expenses of the emigration; and being asked by the plaintiff what had become of the $180,000 received, he replied: Just before I left home to come to the United States, Mr. Ross made a final settlement with the nation of all the money received by him for the emigration; being asked by plaintiff, he says it was in writing, and plaintiff insists his answer is not evidence. He states that he is one of the executive council of the nation, and now a delegate from the nation to the United States.

" Being cross-examined he says: The only power Mr. Ross had to pay claims was to pay such claims as had been passed by the committee or delegates; that he does not know out of what fund Mr. Ross could have saved the $125,000, except the money received for return wagons; that no money ever was paid to any person, nor any claim ever presented by any person to the committee or delegates, for ' return wagon money '; that the witness himself made the contract with the plaintiff's intestate for the hire of his wagons, and no contract was made for, and no reference made to, any return wagons, for it was understood they were all to remain in the nation; that plaintiff's intestate married the sister of witness, and was a citizen of the Cherokee nation; that he sold and disposed of his wagons and teams in the Cherokee nation, except one, with which he returned to the State of Tennessee, for the purpose, as he stated to witness, of bringing out his family; he did not return, but died in Tennessee, and he never in his lifetime to witness, or with his knowledge, set up any claim for return wagons; and witness was present when the account of plaintiff's intestate was settled, and afterwards, when the full balance was paid to the plaintiff; that there were various incidental expenses not estimated for originally, but which had to be paid by the nation, growing out of the delays and other causes in the emigration; that they were paid by the nation, and witness does not know out of what fund they could have been paid, except out of the return wagon money; and witness believes, from the facts he has stated, that the money so paid over by Ross to the nation, and the incidental expenses of the emigration, were paid out of that fund.

" And thereupon, and after the testimony of the said Richard Taylor had been given, the plaintiff further offered to read in evidence from a certain printed document, purporting to be Senate Document 298, 1st Session 29th Congress, two certain papers as follows, marked B and C, (copied in record,) and to lay a foundation therefor gave to the court the following evidence (evidence of Burke and J. R. Rogers, copied in record); and the defendant objected to the admissibility of the

Parks v. Ross.

said papers so offered to be read in evidence, maintaining there was no sufficient foundation laid for them as secondary proof; but the court overruled his said objection, and permitted the same to be read in evidence, and the same was read accordingly, and the defendant excepts thereto, and prays the court to sign and seal this his bill of exceptions, which is done accordingly; and the same is ordered to be enrolled according to the statute, this 10th day of April, 1848.

" W. CRANCH,
JAMES S. MORSELL."

(Then followed Mr. Burke and Mr. Rogers's statements, which are omitted.)

### Plaintiff's First Bill of Exceptions:

" GEORGE W. PARKS, Administrator of SAMUEL PARKS, v. JOHN Ross.

" And the evidence stated in the foregoing bill of exceptions, made part hereof, having been read to the jury, the plaintiff rested ; and thereupon the defendant prayed the court to instruct the jury, that, upon the whole evidence aforesaid, if the same shall be believed by the jury, the plaintiff is not entitled to recover in this action.

" Which instruction the court granted; to the granting of which the plaintiff, by his counsel, excepts, and prays the court to sign and seal this his bill of exceptions, which is accordingly done; this 11th day of April, 1848.

" W. CRANCH,
JAMES S. MORSELL,
JAMES DUNLOP.

### Plaintiff's Second Bill of Exceptions.

" GEORGE W. PARKS, Administrator of SAMUEL PARKS, v. JOHN Ross.

" And thereupon, and upon the whole evidence in the said first and second bill of exceptions of said defendant contained, made part hereof, the defendant by his counsel prays the court to instruct the jury, that, if the same is believed by the jury to be true, the plaintiff is not entitled to recover in this action ; which instruction the court granted ; to the granting of which the plaintiff, by his counsel, excepts, and prays the court to sign, seal, and enroll this his exception, which is accordingly done, this 11th day of April, 1848.

" W. CRANCH,
JAMES DUNLOP."

The counsel for the plaintiff sued out a writ of error, and brought the case up to this court.

It was argued by *Mr. Green*, for the plaintiff in error, and *Mr. Bradley*, for the defendant in error.

*Mr. Green*, for the plaintiff in error, contended that, apart from the testimony of Richard Taylor, it is clear from the evidence that the defendant claimed and received from the United States government the money " in trust" for those who were entitled to it by having furnished transportation ; that the plaintiff's intestate was one of those who furnished transportation ; and that defendant, having claimed and received the money, as trustee, is liable in this action.   See 2 T. R. 370 : Cary *v.* Curtis, 3 Howard, 247, 249 ; 1 Harris & Gill, 258.

But the Circuit Court treated the defendant as the head or executive of a foreign and independent nation, and held that, having received the money as such, he was responsible only to the nation, and could not, *jure gentium*, be personally liable.

This he contended was clearly a mistake both of the facts and of law, and referred to the Cherokee resolutions and to 5 Peters, 1.

If it be contended, on the strength of Taylor's evidence, that the defendant has paid over to the nation, and thereby discharged his liability, it is answered, that defendant could not discharge himself by any settlement with or payment over to the nation, after notice, and pending this suit.   See 10 Peters, 158 ; Bend *v.* Hoyt, 13 Peters, 263, 267.

But there is no evidence that defendant has paid over to the nation ; the only evidence to that effect is found in Taylor's testimony, as follows : " Just before I left home to come to the United States, Mr. Ross made a final settlement with the nation of all the money received for the emigration." This does not say that he paid over to the nation the amount received on account of Parks's wagons, or that he showed any voucher of payment to Parks.   He might have paid to the nation all except the amount due Parks, and said that he retained that on account of this very pending suit.   Moreover, Taylor's evidence shows that the settlement was in writing. Then the written account or a duly certified copy should have been produced (1 Greenleaf's Evidence, 82, 84, 88), and the plaintiff had a right to rule out his evidence on this point.

The statement made by the witness, Taylor, that " the committee or delegates of the emigration never delegated their whole power to John Ross," is contradicted by the Cherokee resolutions of the 11th of November, 1840 ; and by a com-

parison of his testimony with the other evidence in the case, it will be seen that all the material statements therein contained, affecting the plaintiff's right to recover, were in conflict with, and disproved by, the other evidence in the cause. Though called to the stand by the plaintiff, the latter was not conclusively bound by his statements (11 Gill & Johns. 28; 1 Gill, 84; Greenleaf, § 443); nor were the jury, whose province it was to decide between the conflicting evidence.

It will be contended for the plaintiff, that, the evidence being contradictory, or conducing to different results, the effect of the instructions given by the Circuit Court was to withdraw from the jury their proper functions to determine the facts upon the evidence, and to take from them the right of weighing the effect and sufficiency of the evidence; and that, in so far as the instructions given by the Circuit Court were founded on the testimony of the witness Taylor, disregarding the conflict between that and the other evidence in the cause, said instructions were founded on part of the evidence only, and therefore improper. Greenleaf *v.* Birth, 9 Peters, 298; United States *v.* Tillottson, 12 Wheat. 181; Hurt *v.* Miller, 3 A. K. Marsh. 336; Browning *v.* Grady, 10 Ala. 999; 2 Gill & Johns. 403.

*Mr. Bradley,* for defendant in error.

The defendant will endeavor to show that the court did not err in giving the instruction.

There was no evidence legally sufficient to authorize the jury in finding any undertaking on the part of Ross to pay plaintiff's intestate for return wagons.

There was no evidence from which the jury could infer that Ross was personally liable therefor.

There was no evidence tending to prove the material fact of any contract, expressed or implied, between Ross and the said Parks, by which Ross became liable to pay for the return wagons.

The testimony in the cause is so slight and inconclusive, that no rational mind could draw the conclusion therefrom that Ross had come under obligation to pay the plaintiff the return wagon bill claimed by him. There was no evidence conducing to prove the issue on behalf of the plaintiff.

The rule in Maryland on this subject is well settled. The Court of Appeals of that State has said: —

It is the peculiar province of the court to determine all questions of law arising before them; and the undoubted right of the jury to find all matters of fact when evidence legally sufficient for that purpose is submitted for their consideration.

Tyson *v.* Richard, 3 Har. & Johns. 109; Dale *v.* Fassett, Lessee,

Ib. 119; Ford v. Gwinn, Ib. 496; Saunders v. Webster, Ib. 432; Benson v. Hobbs, 4 Har. & Johns. 285; Schwartz v. Tyson, Ib. 291; Benson v. Anderson, Ib. 315; Mercer v. Walmsley, 5 Har. & Johns. 32; and see Davis v. Davis, 7 Har. & Johns. 39; Coale v. Harrington, 7 Har. & Johns. 156; Gist v. Cockey, Ib. 140, 141; Barger v. Collins, Ib. 220; Riggin v. Patapsco Ins. Co., Ib. 295.

Where there is a failure of evidence in respect to any one material fact involved in the issue, the evidence is not legally sufficient to warrant the jury in finding the issue it is offered to sustain; and it is the duty of the court to instruct them accordingly. Cole v. Hebb's Admr., 7 Gill & Johns. 20.

To have granted such an instruction would have been to have authorized the jury to find a fact, of which no testimony legally sufficient to warrant such a finding had been submitted to their consideration. Chesapeake Ins. Co. v. Allegre's Admr., 2 Gill & Johns. 172.

" Where there is no evidence applicable to the issue, or tending to prove any material fact, a total failure of evidence, the court will direct the jury to find accordingly." Davis v. Barney, 2 Gill & Johns. 404.

" From the view which we have taken of the testimony in this cause, we cannot approve the instruction given to the jury. They were instructed, that they might draw conclusions and infer facts which the evidence before them was not legally sufficient to warrant them in finding." McNulty v. Cooper, 3 Gill & Johns. 219.

" Conceding that the court were right in admitting the evidence, their instruction is clearly erroneous, as they submitted to the jury the finding of a fact, of which no testimony legally sufficient for that purpose had been adduced before them. Thus they authorized them to find that the profits of the real estate had been applied to the maintenance of Elizabeth, her brothers and sisters, when not a scintilla of proof had been offered to show such application. On the contrary, the accounts showed that he had charged himself with them as part of the personal estate, and had either paid them away in satisfaction of debts and disbursements, or held them in his hands as part of the general balance of the intestate's personal estate." Burch v. Mundell, 4 Gill & Johns. 452.

Here the proof is, he had applied the return wagon money to incidental expenses in part, and had paid over the residue to the nation.

Where a plaintiff offers no testimony, or such as is so slight and inconclusive that a rational mind cannot draw the conclusions sought to be deduced from it, it is the right of the court,

and their duty, when applied to for that purpose, to instruct the jury that he is not entitled to recover.   Morris *v.* Brickley, 1 Har. & Gill, 107.

This prerogative of the court is never exercised, but in cases where the evidence is so indefinite and unsatisfactory, that nothing but wild, irrational conjecture, or licentious speculation, could induce the jury to pronounce the verdict which is sought at their hands.   Ferguson *v.* Tucker, 2 Har. & Gill, 189, 190.

See further cases in Maryland.

Sanderson *v.* Marks, 1 Har. & Gill, 252 ; Morris *v.* Brickley, Ib. 107 ; Caton *v.* Shaw, 2 Har. & Gill, 13 ; Smith *v.* Edwards, Ib. 411 ; Duvall *v.* Farmers' Bank, 7 Gill & Johns. 78 ; and Gray *v.* Crook, 12 Gill & Johns. 236.

And in this court.

The error complained of is, that the Circuit Court did not give an opinion on a point proposed ; the court was certainly bound to give an opinion, if required, upon any point relevant to the issue.   Douglass *v.* McAlister, 3 Cr. 297.   But it is equally clear, the court cannot be required to give to the jury an opinion on the truth of the testimony in any case.   Smith *v.* Carrington, 4 Cr. 62.   It is the province of the jury to weigh and decide upon the sufficiency of the evidence.   Where there is no evidence to prove a material fact, the court are so bound to instruct the jury, when requested ; but they cannot take from the jury the right of weighing the evidence, and determining what effect it shall have.   Greenleaf *v.* Birth, 9 Peters, 299 ; S. P. Ches. & Ohio Canal Co. *v.* Knapp, Ib. 567, 568 ; Scott *v.* Lloyd, Ib. 445, 446.

In trials at law, whilst it is invariably true that the decision of questions upon the weight of evidence belongs exclusively to the jury, it is equally true that, whenever instructions upon evidence are asked from the court to the jury, it is the right and duty of the former to judge of the relevancy, and by necessary implication, to some extent, of the certainty and definiteness of the evidence proposed.   Irrelevant, impertinent, and immaterial statements a court cannot be called upon to admit as the groundwork of instructions ; it is bound to take care that the evidence on which it shall be called to act is legal, and that it conduces to the issue on behalf of either the plaintiff or of the defendant.   Roach *v.* Hulings, 16 Peters, 323.

Mr. Justice GRIER delivered the opinion of the court.

On the trial of this cause below, after the plaintiff had closed his testimony, the defendant's counsel requested the court to instruct the jury, "that, if the evidence is believed by the jury to be true, the plaintiff is not entitled to recover."   This in-

struction was given by the court, and excepted to by plaintiff. Its correctness is the question for our decision.

It is undoubtedly the peculiar province of the jury to find all matters of fact, and of the court to decide all questions of law arising thereon. But a jury has no right to assume the truth of any material fact, without some evidence legally sufficient to establish it. It is, therefore, error in the court to instruct the jury that they may find a material fact, of which there is no evidence from which it may be legally inferred.

Hence the practice of granting an instruction like the present, which makes it imperative upon the jury to find a verdict for the defendant, and which has in many States superseded the ancient practice of a demurrer to evidence. It answers the same purpose, and should be tested by the same rules. A demurrer to evidence admits not only the facts stated therein, but also every conclusion which a jury might fairly or reasonably infer therefrom. –

The question for our consideration is, therefore, whether the evidence submitted by the plaintiff in this case was sufficient to authorize the jury in finding any contract or undertaking, either express or implied, on the part of John Ross, the defendant, to pay the money demanded in the declaration.

A brief summary of the admitted facts of the case will, we think, sufficiently demonstrate the correctness of the instruction given by the court below, and that, if the defendant had demurred to the evidence in form, he would have been entitled to the judgment of the court.

The plaintiff's intestate was a citizen of the Cherokee nation. In 1838, a large portion of this nation, of which John Ross was the principal chief, had consented to emigrate to the west of the Mississippi River. The Cherokees were permitted to conduct their emigration by their own agents, the expense thereof to be advanced by the United States out of certain moneys or money due to the Cherokees by a former treaty. They accordingly appointed certain persons of their own nation as delegates or special agents to act in behalf of the nation. Of this agency John Ross was the chief, and acted as general superintendent. As such, he received large sums of money from the treasury of the United States for the purpose of defraying the expenses of the emigration, on estimates approved by General Scott. Among these estimates was one for hire of fifty-one wagons and teams, amounting in the whole to $51,000. In this amount was included an item of $14,280, as necessary to pay the hire and expenses of the wagons on their return, at the rate of seven dollars per day. The plaintiff's intestate was owner of four of the fifty-one wagons and

teams employed.   After the emigration was ended, the delegates or agents of the nation settled the accounts, and among others that of plaintiff's intestate, who received the amount of his account and gave a receipt in full.   Nothing was allowed him for return wagon hire in the account settled, and none was claimed by him, as he was himself a Cherokee, and intended to reside in the nation.   Since his death, this suit has been instituted by his administrator, on the mistaken notion, that, because in the money of the nation received by John Ross there was included a sum of $ 14,280 estimated as necessary to pay return wagon hire, therefore the plaintiff's intestate was entitled to his proportional share of it, without any regard to the fact, whether the Cherokees were willing to allow it to him, or whether it was due to him on his own contract with their agents.   There was no evidence whatever tending to show a special contract by John Ross personally to pay for the teams and wagons, either for going or returning. The contract of plaintiff's intestate was with the Cherokee nation, through their known public agents or officers.   John Ross was the superintendent, treasurer, and disbursing officer.   The money in his possession was the money of the nation; the plaintiff's intestate, and all who were employed in assisting the nation to emigrate, were fully aware that John Ross was acting as a public officer, and dealt with him as such.

Now, it is an established rule of law, that an agent who contracts in the name of his principal is not liable to a suit on such contract; much less a public officer, acting for his government.   As regards him the rule is, that he is not responsible on any contract he may make in that capacity; and wherever his contract or engagement is connected with a subject fairly within the scope of his authority, it shall be intended to have been made officially, and in his public character, unless the contrary appears by satisfactory evidence of an absolute and unqualified engagement to be personally liable.

The Cherokees are in many respects a foreign and independent nation.   They are governed by their own laws and officers, chosen by themselves.   And though in a state of pupilage, and under the guardianship of the United States, this government has delegated no power to the courts of this District to arrest the public representatives or agents of Indian nations, who may be casually within their local jurisdiction, and compel them to pay the debts of their nation, either to an individual of their own nation, or a citizen of the United States.

The judgment of the Circuit Court is therefore affirmed, with costs.

### *Order.*

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the District of Columbia, holden in and for the County of Washington, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this court, that the judgment of the said Circuit Court in this cause be, and the same is hereby, affirmed, with costs.