## ELLERSON v. GROVE et al.

### No. 2937.

Circuit Court of Appeals, Fourth Circuit.

Oct. 21, 1930.

A. Hall Johnston, of Asheville, N. C. (John H. McElroy, of Marshall, N. C., on the brief), for appellant.

James G. Merrimon, of Asheville, N. C. (John S. Adams and Merrimon, Adams & Adams, all of Asheville, N. C., on the brief), for appellees.

Before NORTHCOTT, Circuit Judge, and WATKINS and SOPER, District Judges.

WATKINS, District Judge.

This action was brought by appellant against appellees for damages in the sum of

$150,000 for alleged breach of contract. In referring to the proceedings below, appellant and appellees will be respectively referred to as plaintiff and defendants as appropriately describing their status at the time. The terms of the contract, which is alleged to have been breached, were incorporated in a letter dated at Asheville, N. C., November 18, 1926, of which the following is a copy:

"Mr. W. R. Ellerson,

"Hot Springs,
"North Carolina.

"Dear Will:

"As suggested to you yesterday, I think you should have a letter or something in writing from me to show our agreement in regard to the operation of the commercial sand and gravel business.

"In the beginning of your operations I promised if you would find a large commercial sand deposit of good quality and of better quality than any sand produced around Asheville that I would give you a one-fourth interest in the company to be formed, that is to say, you are not to put in any capital, and I·stated that I would see that sufficient capital was secured by the company to run the business in a satisfactory and profitable way; that is to say; I would either furnish the money myself and charge 6% interest or I would see that through my banking connections in St. Louis money sufficient to finance and operate a large commercial sand and gravel business is secured. I, of course, was to pay the helpers you needed to find such a deposit as I desired to secure and from all indications it looks like you have found the things you started out to find, viz.: a high-class commercial sand and a high-class commercial gravel deposit.

"You, of course, are to receive the salary you have been receiving to look after the cattle ranch, and when the gravel and sand business gets in operation and reaches a point where the profits would justify it, your salary is to be increased.

"I wanted you to have something in writing as outlined in this letter so that when we both know that everything is tested and the quality and quantity will warrant us in forming a company you will have this letter, and I will have a copy so that we can carry out a regular contract in accordance with the above statements.

"I think this statement sufficiently covers what I suggested yesterday you should have and think it is all right, and if it does not you can call my attention to any additions that should be made.

"The more I think of the quartz-gravel Deposit which we spent the whole day in going over yesterday, the more I am convinced that it will be one of the large paying operations in North Carolina. In going through the hard work you have done for many years you certainly deserve all of the profit and pleasure this big operation may bring to you and yours."

"Yours very truly,
"EWG:D        [Signed]    E. W. Grove."

The case was tried before Hon. E. Y. Webb, District Judge, on August 20, 1929, who, at the conclusion of plaintiff's testimony, granted a motion of defendants' attorneys to direct a verdict in favor of the defendants on the ground that the evidence showed that the plaintiff was not in any view of the facts proven entitled to recover in the action. In due course plaintiff appealed with the following assignments of error:

1. The court erred in entertaining the motion of the defendants and directing a verdict against the plaintiff.

2. The court erred in signing the judgment as appears in the record.

Although these assignments are of a general nature, the specific issues for the consideration of the court are set out in briefs of counsel for the contending parties and will be discussed in order. At the trial plaintiff testified on his own behalf and introduced four other witnesses. The substance of this testimony is as follows: Plaintiff began to work for E. W. Grove in 1919 and continued in his employment until the latter's death, which occurred on January 27, 1927, at a salary of $400 a month. Up to the time he began the work mentioned in the letter, he had been looking after the cattle business of the said Grove in Madison county where Grove had certain timber lands also. In June, 1926, Ellerson began the work of cruising for commercial sand referred to in the letter, visiting and inspecting the lands and deposits in different sections of the state of North Carolina and, after locating what he considered to be such as was desired both in quality and quantity, employed help, took options on ·the property, had holes dug all across it, employed engineers and had tests made, purchased a certain portion of the lands, and from time to time renewed the option on other lands, paying in cash therefor. He also investigated as to the demand and price for sand and gravel on various markets

and the comparative freight rates on the sand and gravel of these and other known deposits to various known ·or prospective markets. He employed civil engineers who made investigations and testified as to the quality and probable extent and value of the deposits located. One of the witnesses was a practical ·mechanical engineer who had been in the employment of Mr. Grove for several years, and he testified that he went down to the sand and gravel deposit as mechanical engineer to erect the plant for the Grove-Ellerson Sand & Gravel Company as purchasing agent and construction engineer. On just what date this occurred does not appear in the testimony, but the witness stated that he made trips to various places for the purpose of purchasing and did ·purchase certain equipment, including locomotive crane, Diesel engines, etc. The witness also stated that Mr. Grove said he was satisfied with the deposits and thought it was the finest proposition of the kind he had ever seen. All expenses incurred in cruising for deposits, in ·the purchase of lands and options, in the purchase of·machinery, and equipment were paid for exclusively by Mr. Grove. Ellerson testified that he paid nothing whatever. Over objection of defendants' counsel, Ellerson and certain of his witnesses testified as to the anticipated profits to be obtained from the operation of the sand and gravel business and the length of time it would take to prepare and market that which had been found.

It will be observed from the foregoing that Grove died approximately seven months after the negotiations began and a little over two months after the letter was written. After his death, his executors, after paying such bills as had already been contracted for, declined to proceed further with the business, and in consequence thereof this action was begun.

▮ The general rule as to direction of verdicts is set out in the case of Marion County Commissioners v. Clark, 94 U. S. 284, 24 L. Ed. 59, as follows:

"Decided cases may be found where it is held that, if there is a scintilla of evidence in support of a case, the judge is bound to leave it to the jury; but the modern decisions have established a more reasonable rule; to wit, that, before the evidence is left to the jury, there is or may be in every case a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the burden of proof is imposed. Law Rep. 2 Priv. Council Apps 335; Improvement Co. v. Munson, 14 Wall. 448 [20 L. Ed. 867]; Pleasants v. Fant, 22 Wall. 120 [22 L. Ed. 780]; Parks v. Ross, 11 How. 373 [13 L. Ed. 730]; Merchants' Bank v. State Bank, 10 Wall. 637 [19 L. Ed. 1008]; Hickman v. Jones, 9 Wall. 201 [19 L. Ed. 551]."

See also Coughran v. Bigelow, 164 U. S. 307, 17 S. Ct. 117, 41 L. Ed. 442; Patton v. Southern Ry., 111 F. 712 (4th C. C. A.); Woodward et al. v. Chicago, M. & St. P. Ry. Co. (8th C. C. A.) 145 F. 577.

▮ In the last-mentioned case it is said that it is the duty of a court to direct a verdict at the close of the evidence in two classes of cases: (1) That class in which the evidence is undisputed; and (2) that class in which the evidence is conflicting but is of so conclusive a character that the court in the exercise of a sound judicial discretion will set aside the verdict in opposition to it. See also numerous cases cited in that opinion.

The requirements of the rule were met in this case and a verdict was properly directed.

▮ Counsel for appellees earnestly contend that the gift was in consideration of the hard work Ellerson had done for Grove for many years and that there was no consideration within the meaning of the law upon which to base this contract. Siler v. Gray, 86 N. C. 566. A "gift" is a voluntary transfer of property from one to another without consideration. To validate it, three things are necessary: Donor's intention, delivery of the article, and acceptance by donee. Where a gift is consummated, it is as valid in law as anything else. Farrington v. Tennessee, 95 U. S. 679, at page 683, 24 L. Ed. 558. While it is true that plaintiff was already in the employment of Grove at a fixed salary and continued to receive this salary, he was, under the terms of the new agreement, committed to perform certain additional duties and did perform them. We think such additional work constituted a sufficient consideration for the enforcement of the agreement upon which it was performed if and when the conditions thereof were fully complied with. While it may be conceded to be true that Grove's purpose was based largely in the beneficent desire to reward a faithful employee and while that fact alone would not have been sufficient to authorize the enforcement of an unfulfilled promise to make a·gift, there was in this case coupled therewith the requirement of the performance of additional

duties sufficient to constitute a consideration. Grandin v. U. S., 22 Wall. 496, 22 L. Ed. 858; Emerson v. Slater, 22 How. 28, 16 L. Ed. 360; 13 Corpus Juris, p. 315; Institute v. Mebane, 165 N. C. 644, 81 S. E. 1020.

The serious and insurmountable obstacle to plaintiff's recovery lay in the terms of the contract itself; in the limitations which it placed upon the obligations of the parties and their rights; in the fact that it was an executory contract subject to termination before the actual organization of the suggested company, either by disagreement of the parties as to its character and conditions or by the death of one of the parties before consummation; or because either party might determine in the preliminary stages of the work that he was not willing to proceed. It is evident from a reading of the letter that Ellerson himself was under no firm contract to continue his work in connection therewith for any specified time whatever. He might have withdrawn while cruising for the property, while establishing a plant, upon the proposed formation of the company and for lack of approval of the terms of organization, or thereafter. Equally it is evident that Grove was not bound to organize the company in any particular form, whether a partnership or corporation, nor to contribute any specified amount to its organization. It is true that he agreed either to lend to or borrow for the company sufficient capital to run the business in a satisfactory and profitable way. Outside of that, his only obligation was to pay Ellerson's salary for the time that he was at work and to pay the helpers needed to find the deposits and to give Ellerson a one-fourth interest in the company to be organized (when and if organization was agreed upon and perfected). While one of the witnesses spoke of the "Grove-Ellerson Sand & Gravel Company," there is not a word of testimony to indicate that such company was ever formed or what assets went or were to go into it. Indeed, the complaint itself does not allege nor does plaintiff contend that it was ever organized. Certainly, whatever money was furnished or to be furnished to such a company by Grove under the agreement was by way of loan. It is significant that the letter written approximately two months before Grove's death states that it was given "so that when we both know that everything is tested and the quality and quantity will warrant us in forming a company, you will have this letter and I will have a copy so that we can carry out a regular contract

in accordance with the above statements." It is also significant that neither the regular contract was ever entered into nor the company ever formed. Since the memorandum of agreement was reduced to writing, it is presumed that it contained all the agreements of the parties, and this is further emphasized by the fact that Ellerson was requested to call attention to any additions which he thought should be made, and that he never suggested any amendments.

Had this been a suit for specific performance for failure to organize the company, the court would have been wholly without information not only as to the terms of the organization but as to the very nature of the company itself. Webster defines "company" as: "A number of persons united for the same purpose or in a joint concern; as a company of merchants. The word is applicable to private partnerships or incorporated bodies of men; hence, it may signify a firm, house, or partnership; or a corporation, as the East India Company." See also Kansas City v. Vineyard, 128 Mo. 75, 30 S. W. 326, 327; State v. Stone, 118 Mo. 388, 24 S. W. 164, 165, 25 L. R. A. 243, 40 Am. St. Rep. 388; Leader Printing Co. v. Lowry, 9 Okl. 89, 59 P. 242; 2 Words and Phrases, First Series, p. 1349 and cases therein cited. In respect of the organization of the company the agreement was a highly personal one and it could only be effected by the personal agreement of the parties. Certainly it is not within the powers of the personal representatives of one after his decease to act for him and determine how his discretion should have been exercised.

Further, had the company been formed and consisted of a partnership, it would have been dissolved upon Grove's death. Both at common law and under statutory provisions in a number of jurisdictions the death of a partner operates as a dissolution of the partnership not only with respect to the deceased partner or his estate but with respect to all the partners, although such death occurs prior to the expiration of the agreed term of the partnership, unless there is an agreement for the continuance of the partnership notwithstanding such event. 47 Corpus Juris, § 767, pp. 1111, 1112, and numerous authorities therein cited. This doctrine is emphasized in Burwell v. Mandeville's Executors, 2 How. 560, pages 576, 577, 11 L. Ed. 378, wherein Mr. Justice Story, delivering the opinion of the court, states the rule to be, in substance, as follows: That every partnership is by general rule of law dissolved by the

death of one of the partners and that while it is competent for the partners to provide by agreement for the continuance of the partnership after death, this can take place only by virtue of the agreement as the act of the parties, and not by mere operation of law, and that while a partner may provide by his will for the continuance of the partnership after death and this provision may become obligatory if assented to by the surviving partner, nevertheless in each case such agreement and authority must be clearly made out. The court continues:

"And this leads us to remark, that nothing but the most clear and unambiguous language, demonstrating in the most positive manner that the testator intends to make his general assets liable for all debts contracted in the continued trade after his death, and not merely to limit it to the funds embarked in that trade, would justify the court in arriving at such a conclusion. * * * "

So in the case of Scholefield et al. v. Eichelberger, 7 Pet. 586, 8 L. Ed. 793, it was held that, although there is no doubt that the liability of a deceased copartner as well as his interest in the profits of the concern may by contract be extended beyond his death, nevertheless, without such a stipulation, even in the case of a copartnership for a term of years, it is clear that death dissolves the concern. See also 47 Corpus Juris, § 655, p. 1069. The general rule is recognized in many North Carolina cases which need not be referred to here.

It appears from the testimony that Grove had spent in all a sum exceeding $30,000 in furtherance of the enterprise, and it is alleged in paragraph 5 of the complaint that this was done with the intent and purpose of Grove to carry out the contract in every respect. It is significant, however, that this paragraph of the complaint itself states that Grove "fully intended and, had he lived, as plaintiff is advised and believes, would have expended not less than $150,000.00 in organizing said company and in installing the necessary machinery and equipment to run the same." Upon those facts plaintiff bases his claim that he is entitled to $50,000 as a fourth interest in the corporation, and he further states that, if the corporation had been organized, his profits would have amounted to not less than $100,000. Because of the amount already expended by Grove and the work which had been done by plaintiff, it is now contended that the executors were bound to carry out what plaintiff believed was the intention of Grove to expend a large sum, the amount of which was for the personal determination of Grove if he had lived, to turn over to the company property and assets which had never been turned over to it and to give the plaintiff a fourth interest in the amounts advanced and to be advanced, although Grove had only agreed that whatever money he furnished the company or procured for it was by way of loan. Whatever may have been the personal intention of Grove, and we may assume for the purpose of the issue involved that it is correctly set forth in the complaint, it is still shown that, whether he did or did not intend to turn over the property purchased and to be purchased to the company as a gift and to expend the sum suggested, the enforcement of such as a gift would have been without consideration and ineffective until consummated and that it was a matter entirely for his personal decision as to whether he would go further forward with his plans to organize the company had he lived. The executors were neither charged with the duty nor invested with the right to carry out an intention not expressly provided for by contract. In the case of Dumont v. Heighton, 14 Ariz. 25, 123 P. 306, 39 L. R. A. (N. S.) 1187, at pages 1188, 1189, quoting from 2 Chitty on Contracts (11th Am. Ed.) 1406, it is said that while an executor or administrator is liable in general to the extent of the assets which come into his hands to be administered upon all the contracts of the deceased remaining undischarged at his death, nevertheless contracts strictly personal in their nature determine upon the death of the party by whom the personal service is to be performed, and that personal representatives of the deceased are not liable for the performance of his contracts. See also Mendenhall v. Davis, 52 Wash. 169, 100 P. 336, 21 L. R. A. (N. S.) 914, 17 Ann. Cas. 179, wherein it is said that where personal considerations are of the foundation of the contract, the death of either party puts an end to the relation; and the contract is dissolved unless there be a stipulation, express or implied, to the contrary, and that both parties are regarded as being discharged from their obligation, not in breach of their contract but by implied condition. See also Lacy v. Getman, 119 N. Y. 109, 23 N. E. 452, 6 L. R. A. 728, 16 Am. St. Rep. 806; Labatt's Master & Servant, vol. 1, p. 671, § 215.

From what has been said above it is clear that plaintiff had no more than a prospective interest in the property which had been purchased or optioned by Grove and

could not have, until the company was formed and by Grove's voluntary act, acquired this property as a gift. The only other question, therefore, is whether the plaintiff is entitled to profits which might have been anticipated from the organization and operation of the company. These, of course, could not arise if the organization of the company was legally prevented or failed of consummation through no legal default of Grove. Since the company was never organized and the executors were without right to determine the conditions and character of its organization, plaintiff's prospective right to any profits it might earn, of course, terminated with Grove's death. As will be seen above, even if the company had been organized as a partnership, this would have been dissolved upon and by Grove's death and plaintiff's interest would have been limited to one-fourth of the assets then in hand. The executors would have had no right to continue the business after such dissolution and the plaintiff could not have recovered anticipated profits. The rule as to remote, speculative, and uncertain profits is laid down with unusual clearness in the case of Central Coal & Coke Co. v. Hartman, 111 F. 96 (8th C. C. A.) Anticipated profits of a business are generally so dependent upon numerous and uncertain contingencies that their amount is not susceptible of proof with any reasonable degree of certainty, and hence the general rule is that the expected profits of a commercial business are too remote, speculative, and uncertain to warrant a judgment for their loss. Howard v. Manufacturing Co., 139 U. S. 199, 206, 11 S. Ct. 500, 35 L. Ed. 147; Cincinnati Siemens-Lungren Gas Illuminating Co. v. Western Siemens-Lungren Co., 152 U. S. 200, 205, 14 S. Ct. 523, 38 L. Ed. 411. It is true that the loss of profits from the destruction or interruption of an established business may be recovered where the plaintiff makes it reasonably certain by competent proof what the amount of his loss actually was. This, of course, assumes that no event has intervened to dissolve the business but that the claimant is entitled to its continuance. The general rule is that to entitle one to recover such anticipated profits it must be shown that a business already established has been interrupted. He who is prevented from embarking in a new business can recover no profits because there are no provable data of past business from which the fact of anticipated profits would have been realized can be legally deduced. I Sedg. Dam. § 183; Red v. City Council of Augusta, 25 Ga. 386. Even in case of an established business, to entitle one to recovery requires proof of the expenses and income of the particular business for a reasonable length of time before as well as during the interruption. Goebel v. Hough, 26 Minn. 252, 2 N. W. 847, 849. In Howard v. Stillwell & Bierce Mfg. Co., 139 U. S. 199, at pages 205, 206, et seq., 11 S. Ct. 500, 503, 35 L. Ed. 147, the court said:

"The authorities both in the United States and England are agreed that, as a general rule, subject to certain well-established qualifications, the anticipated profits prevented by the breach of a contract are not recoverable in the way of damages for such breach; but in the application of this principle the same uniformity in the decisions does not exist. * * * The grounds upon which the general rule of excluding profits, in estimating damages, rests, are (1) that in the greater number of cases such expected profits are too dependent upon numerous, uncertain, and changing contingencies to constitute a definite and trustworthy measure of actual damages; (2) because such loss of profits is ordinarily remote, and not, as a matter of course, the direct and immediate result of the non-fulfillment of the contract; (3) and because most frequently the engagement to pay such loss of profits, in case of default in the performance, is not a part of the contract itself, nor can it be implied from its nature and terms." Citing numerous authorities.

In every respect, therefore, plaintiff's claim falls short of a legal basis for recovery, and the decision of the lower court, is, and must be, affirmed.