## LEWIS v. BLOEDE et al.

(Circuit Court of Appeals, Fourth Circuit. November 7, 1912.)

No. 1,091.

1. TORTS (§ 12*)—RIGHT OF ACTION—WRONGFULLY PREVENTING CONTRACT.

The doctrine being well established that an action in tort will lie for a wrongful interference with the performance of an executory contract, the same principle will sustain an action for wrongfully preventing one from entering into a contract, where the evidence establishes with sufficient clearness that but for such interference, the contract would have been made.

[Ed. Note.—For other cases, see Torts, Cent. Dig. § 13; Dec. Dig. § 12.*]

2. APPEAL AND ERROR (§ 927*)—REVIEW—PRESUMPTIONS—DIRECTION OF VERDICT.

In passing on an exception to an instruction directing a verdict, the evidence is to be considered in the light most favorable to the party against whom the verdict is directed; and where there is a contradiction between witnesses in regard to a material question, it must be taken that the jury would have accepted the testimony of the witnesses for such party as true.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 2912, 2917, 3748, 4024; Dec. Dig. § 927.*]

3. TORTS (§ 28*)—ACTION—SUFFICIENCY OF EVIDENCE.

Plaintiff and defendant submitted to the Bureau of Engraving and Printing competitive bids to furnish a certain kind of black for making ink under contract for a year, as called for by specifications. The ink maker of the bureau, on whom the committee in charge of the bids and the director relied as an expert, gave plaintiff's sample the highest rating, and reported that its price was the lowest, and the director stated publicly to plaintiff that it would be awarded the contract. Subsequently the ink maker addressed a letter to the director, stating that he had perfected an ink which was superior to that in use, such as was made from the black on which plaintiff bid, and recommending that all bids therefor be rejected, which was done. The ink maker had previously entered into a contract with defendant by which he was to receive $25,-000 for his process, to be paid from the proceeds of sales to the bureau. This product was covered by another item on which bids were made, and defendant's bid was accepted, and during the year it furnished 191,000 pounds thereunder at 45 cents per pound; plaintiff's bid on the item which was rejected being 29 cents. In an action by plaintiff against defendant for wrongfully and maliciously inducing the ink maker to deprive it of the contract, there was conflicting testimony as to whether the ink maker in fact originated the process by which the black furnished by defendant was made. It was also shown that defendant and the ink maker were subsequently indicted for conspiracy to defraud the United States on account of the transaction, pleaded guilty, and were fined. Held that, on such evidence, plaintiff was entitled to have the case submitted to the jury, and that the direction of a verdict for defendant was error.

[Ed. Note.—For other cases, see Torts, Cent. Dig. §§ 35–37; Dec. Dig. § 28.*]

4. TORTS (§ 12*)—"MALICIOUS."

The word "malicious," as characterizing the action of a defendant in interfering with the business or contract rights of a plaintiff, does not

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

import personal ill will, but merely a wrongful purpose to injure, or to gain some advantage at plaintiff's expense.

[Ed. Note.—For other cases, see Torts, Cent. Dig. § 13; Dec. Dig. § 12.*

For other definitions, see Words and Phrases, vol. 5, p. 4307; vol. 8, p. 7714.]

In Error to the Circuit Court of the United States for the District of Maryland, at Baltimore; John C. Rose, Judge.

Action at law by George B. Lewis, receiver of the Slingluff & Glacken Chemical Company, against Victor G. Bloede and the Victor G. Bloede Company of Baltimore City. Judgment for defendants, and plaintiff brings error. Reversed.

The facts disclosed by the record, material to the decision of the question presented upon plaintiff's bill of exception, are:

The Bureau of Engraving and Printing is a subdepartment of the Treasury Department of the United States, created by act of Congress. Act July 11, 1862, c. 142, 12 Stat. 532. For a number of years prior to 1901–02, the Department used large quantities of printing inks. These inks were made in the ink-making division, under the control of an officer known as the "chemist and ink maker." The Department made contracts annually for the materials required in its work, beginning on July 1st of each year. Pursuant to the law and rules of the Department, the Director caused specifications of the several kinds of ink, and other materials required, to be made, and, on February 1, 1901, advertised the same, inviting persons to submit bids or offers for furnishing inks and such supplies during the fiscal year. Among other specifications advertised, and for which bids were invited, were the following:

"5. Black No. 1. Pure Carbon Black. Must not contain more than 4½% ash, nor any admixture of carbon black. Must be exactly same in color, degree of fineness, and texture as specimen sent, and must coincide with specimen in chemical analysis and physical properties." In the specification it was estimated that 40,000 pounds would be required during the year, to be called for in requisitions of 10,000 pounds each.

"6. No. 2. Pure Calcined Black. Must be thoroughly calcined of a uniform sharp grain, free from all adulterations, such as barytes, etc., and exactly the same as specimens sent bidder in color and texture and physical properties." It was estimated that 75,000 pounds would be required during the year, to be called for in requisitions of 15,000 pounds each.

"7. Hard Black. Suitable for the finest plate work. No specimen will be sent bidder." It was estimated that 1,000 pounds would be required during the year, to be called for in requisitions of 500 pounds each.

"8. Soft Black. Suitable for finest plate work. No specimen will be sent bidder." Estimated quantity required during year 1,000 pounds, to be called for in requisitions of 250 pounds each. It was stated that: "It is contemplated to make requisition for not less than the estimated quantity for the year for each requisition stated in the schedule, except that it may be desirable to order larger quantities than stated in items 7 and 8, and correspondingly smaller quantities in items 5 and 6. But, as the requisitions of the Bureau will be subject to fluctuations that may not be accurately anticipated, the right is reserved to make requisitions as often as necessary and for any quantity, more or less, than stated, or to make no requisition in the year for any color that may not be needed."

This was an unusual statement, and had not theretofore been made in the specifications. Mr. Thomas, a witness for plaintiff, and clerk in the Bureau, describes the method pursued by the Bureau in receiving and dealing with bids made by persons proposing to furnish supplies. He says that they are all submitted in cipher; that is, in containers sent out by the Bureau, which are uniform. Each sample has a small tag having on it the item number,

with the cipher number adopted by the bidder. The samples in cipher are submitted to the several examiners for their reports; he giving the tag on the sample a number and preparing a new tag, with corresponding number. He detaches the original tag and replaces it with the new tag. All of the tags removed from the samples are placed in an envelope and kept intact until the day of the opening. All of the samples are promptly referred to the chemist in charge of the ink-making department of the Bureau, whose duty it is to test, or have them tested, and report the ratings to the Director in a ratio of 100 per cent. for the best sample. The tags containing the cipher number are removed from the samples, placed in an envelope, and kept intact until the day of the opening. At that time the envelopes containing the cipher words of the several bidders are disclosed. Up to that time no one in the Bureau is supposed to know the identity of any bidder, or the price. When all reports are in, the Director issues a circular to each bidder, inviting him to be present on a day named. On this day the envelopes are opened and the identity of the bidders disclosed. After the ratings are announced, the samples are turned over to a committee of three for the preparation of a report to the Director of the Bureau. This committee is made up from the employés of the Department. Edwin M. Van Dyck was, during the year 1900 and 1901, the chemist and ink maker in charge of the ink-making division. The Slingluff & Glacken Chemical Company, in response to the advertisement of February 1, 1901, submitted samples of "5 Black, No. 1, Pure Bone, Carbon Black," and "6, No. 2, Pure Calcined Black," together with prices. Defendant Victor G. Bloede Company also submitted samples and prices for the same specifications. Defendant corporation also submitted sample and bid for "7 Hard Black" and "8 Soft Black."

In accordance with the custom and rules of the Bureau, the bids being all in, and tests made, notice was given that, on May 7, 1901, all bids would be opened. Raymond M. Glacken, of the Slingluff & Glacken Chemical Company, was present on the day named. He testified, and it appears from the record that the examiner's report showed, that the samples submitted by the Slingluff & Glacken Chemical Company, for "5 Hard Black" was rated "100 Ash. 3.68%, price 29 cents per pound." This was the highest rating and the lowest price for this "Black." This report was signed and submitted by E. M. Van Dyck, examiner, and approved by J. P. Swan, chief of printing division.

Glacken testified: The Director, after the superior quality of No. 5 had been announced, decided and stated that the contract would be given to the Slingluff & Glacken Chemical Company, but he would reserve the right to call for a 100-pound sample. He stated publicly and confirmed it to me personally and privately afterwards. He announced publicly that the Slingluff & Glacken bid was the best bid and the price was the lowest, and he would reserve the right to ask for a 100-pound sample. Afterwards I walked up to the desk, just like I would go to speak to his honor here, and he confirmed the same thing, and said: 'You will receive a requisition for a 100-pound sample.'" The sample for "5 Black" submitted by the Victor G. Bloede Company of "5 Black" was rated lower than that of the Slingluff & Glacken Chemical Company. Glacken testified that the Chemical Company was, at all times, prepared, ready, willing, and able to furnish the 100-pound sample, but was never called on for it; that he made several efforts to learn the reason why the sample was not called for, but failed; that the Chemical Company was equipped and able to furnish the quantity of "5 Black" required by the Bureau; that they had expended large sums of money in preparing for the manufacture of the ink. The price which they were to receive was 29 cents per pound; the cost of manufacturing was 14 cents per pound. The plaintiff company could have furnished, if called upon by the government, 190,000 pounds. No requisition was made for the 100-pound sample. Witness Glacken testified that he made two trips to the Director to inquire why the requisition was not made, but got no information. He also wrote to the Department two letters, but received no reply. He also testified that Charles Schon, representing the Bloede Company, was present when the bids were announced. After the announcement, he saw Mr. Schon

go to the telephone and ask for Bloede Company in Baltimore, and to be connected with Victor G. Bloede. He heard him say that the Slingluff & Glacken Company had submitted the lowest price and had a good sample on No. 5; that Bloede need not be worried; that he thought that they still had a good chance of getting their black through. Schon was Bloede's brother-in-law. The record of the Department was introduced, showing the report of the committee appointed to "classify and arrange proposals." In this report, immediately following a list of the bids for "Item 5, Black No. 5, Black 1," are the words: "All bids rejected. The article will not be required"—and for "Item 7 Hard Black": "Bidder—Victor G. Bloede Company—at 45 cents (sample B) accepted."

Plaintiff alleges in the fifth count of his declaration: "That the said Slingluff & Glacken Chemical Company in the year 1901 made a bid to furnish a certain commodity known as 'blacks' to the Treasury Department of the United States, and was about to have a contract awarded it under which it would, at great profit to itself, have furnished a great quantity, to wit, about 190,000 pounds of said 'blacks' to the said Treasury Department of the United States, when it was prevented from obtaining said contract by the exertions and influence of one Edwin M. Van Dyck, then an official of said Treasury Department known as 'chemist and ink maker.' And the said Van Dyck was induced to interfere and prevent the said Slingluff & Glacken Chemical Company from obtaining said contract by the malicious, unlawful, and corrupt conduct of the defendant, Victor G. Bloede, who unlawfully paid money to said Van Dyck to induce him to interfere and prevent the award of said contract to furnish said 'blacks' to the said Slingluff & Glacken Chemical Company. And the said Victor G. Bloede was the president of the defendant, the Victor G. Bloede Company of Baltimore City, and was acting as its agent and in its behalf, when he so maliciously and corruptly paid said money to said Van Dyck. That the said corrupt bargain and conspiracy between defendant Bloede and Van Dyck was concealed, and discovered only by reason of a criminal prosecution instituted against them by the government, during the year 1907."

There are several counts in the declaration, but the foregoing is the averment upon which, in the light of the testimony, and the ruling of the court below, plaintiff's cause of action is based. Defendants denied each and every of the material allegations. Evidence was introduced tending to show that complaint had been made, by the printers, of the Black No. 5, upon which the Slingluff & Glacken Chemical Company had put in the bid, and that the Department, or the officer in charge, had, prior to 1901, made efforts to get a satisfactory ink—one that would meet the requirement of the Department. Experiments had been made for that purpose.

Van Dyck testified that, with a view of getting up an ink that would meet the requirements, he was experimenting to produce a black equal, or superior, to the Eddy black, which was conceded to be the only satisfactory black which had come into the Bureau. These experiments were carried on during, and after, business hours. His superior officers had no knowledge of what he was doing. In the latter part of 1900, or the early part of 1901, he had succeeded in making a black ink which was pronounced, by those who tried it, superior to the Eddy black. It was so pronounced in the proving room. When he had accomplished this result, he corresponded with, or spoke to, Bloede, telling him that he had succeeded in producing a black superior to the Eddy black, and that he wanted to sell his product. A letter was introduced by defendant from defendant Bloede to Van Dyck, bearing date Feb. 19, 1901, replying to a letter from Van Dyck, in which he refers to a proposition submitted by Van Dyck for the sale of his discovery. Bloede, after discussing the financial aspect of the question, writes: "There are other objections, which have arisen upon full consideration, and that is the position the matter would put us in, in case we got the government contract, and any question should be raised. I cannot help but think that, in such case, the motives of the transaction would be questioned, and we would inevitably lose standing with the Department, unless direct permission were given by the powers that be for this special transaction. There never would

be any question on such work as you have been doing for us with the consent of Mr. Vanderlip, but I do not believe that the payment of $25,000 would come within the scope of the matter as he understood it. Of course, this would apply equally, were the amount paid in one sum or installments; but if you were willing to put the matter before Mr. Vanderlip, and he made no objection, this would entirely remove objection to the deal on the grounds of policy or morals, whichever way one wants to put it, and we would be ready to deal with you fairly and justly, and to the full extent we think the business would warrant so far as the pecuniary interests are concerned."

To this letter Van Dyck replied, February 26, 1901: "From your letter, received this a. m., I am led to infer that you rather prefer to 'go it alone' on the whole matter of the black business. As you state, however, that you would be willing to 'treat with me' in the matter if I could get Mr. Vanderlip's full permission for the particular transaction, I have to-day seen Assistant Secretary (Mr.) Vanderlip and Secretary Gage (I could not go higher in my Department), and put the whole matter before them, with every possible contingency which might arise. I am very glad to state that Secretary Gage, in the presence of Mr. Vanderlip and myself, ruled that I had a perfect right to dispose of the 'products of my brain' (to quote Secretary Gage exactly) at any price which I might be able to secure, so long as I was not competing with the government or injuring its cause in any way, to which Secretary Vanderlip assented. Furthermore, they have given their pronounced desire to have those products used at the Bureau, if they are found to be equal to the test and can save money over the best. This is certainly a great encouragement for their ultimate use at the Bureau. I could not have asked for a more satisfactory interview, had I planned it. I stated that you were a possible customer, but no restrictions were placed on me as to customer or price. Now I have completely overcome one of your principal objections," etc. Van Dyck testified that what was stated in the letter took place between Mr. Vanderlip, Secretary Gage, and himself; that he had nothing to do with the "wording of the specifications"; that they were prepared by Mr. Sullivan, Assistant Director of the Bureau.

On March 14, 1901, Van Dyck entered into a contract with Bloede, reciting: "That whereas, Van Dyck, chemist for the Bureau of Engraving and Printing, had invented certain new and useful improvements for the production of what is known as hard and soft black for use in plate printing," etc., "and having received the permission of Hon. Lyman J. Gage, Secretary of the Treasury of the United States, who is the responsible head of said Bureau of Engraving and Printing, to dispose of said invention, is desirous of making such disposition to Victor G. Bloede of Baltimore City; and whereas, the said Bloede is desirous of securing said discoveries and inventions for his own exclusive use: * * * The said Edwin M. Van Dyck doth hereby sell, and the said Bloede doth hereby buy, said process for a consideration of twenty-five thousand dollars to be paid as hereinafter provided; one thousand dollars thereof being the consideration for the process of regulating the fineness of black, the said E. M. Van Dyck guaranteeing its efficiency, and twenty-four thousand dollars thereof being the consideration for the production of the said hard and soft blacks. For the consideration aforesaid, the said Van Dyck assigns and transfers his entire right and interest in and to said processes, and agrees to give to Victor G. Bloede all the knowledge, information, and details he possesses, or may hereafter acquire, with reference to the manufacture of the said blacks herein referred to, and to co-operate with the said Bloede for the production of the best possible results. * * * The method of payment of the agreed sum of twenty-five thousand dollars is to be as follows: Upon the signing of this agreement, and the delivery by said Van Dyck to the said Bloede of a full, accurate, and detailed description in writing of the processes and inventions covered by this agreement, the said Bloede shall pay to the said Van Dyck the sum of one thousand dollars. * * * Upon the approval by the said Bloede of the practicability of said processes and inventions for the manufacture of hard and soft blacks, the said Bloede agrees to immediately provide a practical plant for the further testing of the processes, as well as the production of the two grades of black

in such quantities as may be required to meet the commercial demands therefor. A full and accurate account of the cost of production of said special blacks, including therein interest on the actual value of said plants provided for their production, is to be kept by the said Bloede separate and distinct from his general business (said accounts are to be open to the inspection of the said Van Dyck at all reasonable times), and the net profits of the sales thereof, after deducting the cost of production as ascertained from said special account, shall be divided; two-thirds thereof being paid to the said Van Dyck and one-third to the said Bloede, the computations of profits and the division and payments thereof to be made quarterly." It was further provided that, when the profits had reached the aggregate sum of $24,000, all further payments to Van Dyck should cease, and the processes and inventions should become the exclusive property of said Bloede. "Should, however, the said processes be found impracticable or commercially disadvantageous, it is agreed that the said Bloede may, at any time, discontinue the use thereof, and that, in such case, all liability on the part of said Bloede for any part of the said sum of $24,000 then unpaid shall at once cease and terminate," etc.

On August 28, 1901, a "Supplemental Agreement" was entered into by the parties, whereby, in lieu of the division of the proceeds of the sale as provided in the first agreement, said Bloede agreed "to pay said E. M. Van Dyck the sum of ten cents per pound upon each and every pound of any of the black made by said process and sold at 45 cents per pound, the payment to said Van Dyck to be made as soon as any order for any of such black has been executed and the goods have been accepted and paid for by the customers." It was also provided that when the amount paid to Van Dyck, under said agreement, reached the sum of $24,000, all further payments should cease, etc. Van Dyck testified that he received from Bloede, on account of said agreement, during the first year and nine months of its existence, on his part of the profits on the inks sold to the Department, the sum of $24,000; that he received over $1,000 a month from his contracts, while his salary was $2,000 a year. He also testified that Mathew S. Hopkins had "absolutely nothing" to do with the preparation or experiments made in the preparation of the hard black for plate printing. He explained the process by which the experiments were made; that he had nothing to do with passing upon the samples of "Item No. 7." It was a complete black, it required no analysis. No. 7 was tested in the Printing and Engraving Department, of which Mr. Hill was chief, and not in the Chemist's Department. Attached to the record of the report made by the committee to the Department is a letter bearing date May 25, 1901, addressed to the Director, by Van Dyck, in the following words: "I have made up Hard Black No. 17 into a note ink, and have completed a very thorough practical press trial of same, and find it satisfactory in every particular, as report of superintendent in charge, herewith submitted, will show."

No. 17 is the same as Black No. 7. A letter in the same terms is attached signed by J. P. Swan, Chief of Printing Division, bearing date May 27, 1901. Other letters to the same effect are in the record, signed by the foreman of the press room and J. R. Hill, Chief of Engraving Division. There is also a letter in the record to the Director, bearing date May 27, 1901, in the following words: "Inasmuch as the so-called C. P. Black No. 1, now in use, has given considerable trouble during the last year in the working quality of the note and revenue inks, and also has certain properties which tend to make the notes printed with it less desirable than they should be, I respectfully recommend that all bids on this item be rejected, and that the blacks designated as 'Item #6, Black No. 2' and 'Item #7, Hard Black,' and 'Item No. 8, Soft Black,' be used during the year beginning July 1, 1901, in such proportions as may best subserve the interest of the Bureau." This was approved by W. M. Meredith, Director. Mr. Thomas further testified that the black was ordered from the contractor on the requisition of Van Dyck, the chief of the ink-making division; that he ordered, of No. 7, 191,351 pounds; that Van Dyck's official duties were preparing the inks used by the Bureau of Engraving and Printing for the printing of internal revenue stamps, national securities of all kinds, postage stamps, etc.

Mr. Steinbrenner, a member of the committee of three testified: "The committee relied on Mr. Van Dyck in everything in the chemical line in the ink-making division, he being a chemist, and we not being chemists, and he also being a practical ink maker, I understand, and we had to rely upon him for all reports and the awarding of the bids. The rejection of No. 5 depended upon Mr. Van Dyck's report to the committee. If there was not any report made, the committee would have to take the lowest bidder." Witness had been in the Bureau 17 years; had never known the report of the committee to be rejected by the Director.

Mr. Ferguson, Assistant Director of the Bureau, testified that he was clerk in charge of purchases and supplies, in the Bureau; that he had charge of preparing the specifications for the proposals; that he made up the copy for the printer, and ascertained what quantities it was estimated would be purchased; that he knew Van Dyck in 1901 as chemist and ink maker; he conferred with him about getting up these specifications, as well as with other chiefs of divisions about other kinds of material; he had no doubt he conferred with Van Dyck about the forms of specification of item 5 and item 7 in the specification of 1901; he does not particularly recall about this item; in the ordinary course he would rely upon what the ink maker wanted, always unless there was something unusual about it; that No. 5 had not been entirely satisfactory; when he came to draw his specification for 1901, No. 5 was still retained, but there was inserted No. 7 and No. 8, at the instigation of Mr. Sullivan to the best of his recollection; that he had no doubt consulted Mr. Van Dyck that year, but this particular change was made at the suggestion of Mr. Sullivan. The evidence showed that the No. 5 Black, upon which the Slingluff & Glacken Chemical Company made bid, was furnished, prior to 1901, by Bloede. It was of this black that complaint was made by the printers. Witness Roche testified that there had been considerable complaint against the ink in use then, and the union instructed the committee to go to the Treasury Department and lodge a complaint against the ink then in use, which they did, and had an interview with Mr. Vanderlip, Assistant Secretary of the Treasury. * * * Mr. Vanderlip ordered Mr. Morris to go out into the market and purchase an ink which would be satisfactory, and which would not cause a reduction in the salary of the plate printers. Several witnesses, who were connected with the Bureau, testified that they had no personal recollection of such complaints.

Defendant Bloede testified that he had been, since 1884, engaged in the manufacture of colors and chemicals; that, in consequence of conversations with Mr. Morris, who represented the Treasury Department, he undertook to have experiments made to produce a satisfactory black; that the No. 5 black was and had always been unsatisfactory. He gave a detailed account of his efforts and their connections with the Bureau; that during the years 1898 and 1899 continuous experiments were being made, with a view to bettering the product and discovering a better form of black to use; that these experiments cost the company $20,000; that, during the course of these experiments, numerous samples were sent over to the Department, and tested by Mr. Van Dyck, and reported upon. He said: "Some time in the latter part of 1900, I think it was, possibly very early in 1901—I think, however, it was 1900—Mr. Van Dyck wrote to me that he would like to see me in Washington. I went over to Washington, and Mr. Van Dyck informed me that he had developed from these various carbons, that had been furnished him, by a treatment of his own, by reworking and regrinding, he had produced what he believed to be an ideal plate printing color. He then said he had spent a good deal of time and experimenting on the matter of the Eddy black, and the time he had spent had been most spent in his own time, and that he wanted to make some arrangement by which he would be compensated for the labor which he had put into this work. I called his attention then at once to the fact that it was very delicate ground; that I did not consider it well advised to take up the question of compensating him; that no matter how intimate the relations were then and how well he understood, and how well the Department understood, that the thing was absolutely fair and just, I felt that it would be an indiscreet thing to offer him any compensation,

whatever for anything that he might have done. I told him that I would be willing to treat with him, however, of the whole matter. We were exceedingly friendly with the Secretary of the Treasury, and he was aware of everything that had been done in that line from beginning to end, especially Mr. Morris. * * * I told Mr. Van Dyck that I recognized the principle of the fact that he was an employé in the Department, and that that did not compensate him for the discovery of something that might prove very valuable. At the same time, with the confidential position that I occupied, I could not, under any circumstances, go into an arrangement of that kind with him, unless it should be with the full knowledge and consent of the Secretary of the Treasury. In other words, I suggested that the whole matter be laid before the Secretary of the Treasury. I then came home, and consulted my counsel on the subject, and told him just what I had done, and he approved it. He said it would not be a wise thing to do under any circumstances, unless Mr. Van Dyck can get that permission, but with that permission there was no earthly objection to my entering into this agreement with Mr. Van Dyck. As I understand it, the whole matter was laid before Secretary Gage." The witness says that he never discussed the matter with Secretary Gage—saw him afterwards and thanked him for giving permission to Van Dyck. The contract with Van Dyck was then signed. It cost less to make No. 7 than No. 5. Witness knew nothing of the preparation of the specifications of 1901 until they were exhibited. Absolutely nothing took place between Van Dyck and witness with a view of influencing his judgment in regard to the bids, etc., either before or after the bids were made or opened. They had no communication on the subject.

Plaintiff introduced M. S. Hopkins, who testified that he was a chemist; was in the employment of the Victor G. Blóede Company in 1900–01; that he was with the Bloede Company when they put in their bid for Hard Black No. 7 in 1901; witness identified Hard Black No. 7 by reading from the specifications for the fiscal year 1901–1902, and stated that he is thoroughly familiar with all the ingredients in it; that he devised the formula, and did pretty much all the work that was done on it; he does not regard it in the light of an invention, because he cannot take a patent on it; nor does he regard it as a discovery, because every ingredient in it was discovered years before; he compounded the black and ground the individual ingredients to a suitable state of fineness; he was the sole chemist employed with Bloede Company at that time; he compounded the black at Mr. Bloede's request. The witness gave a detailed account of his experimental work and its result, saying: "All the time that he had been experimenting with the black, the Bloede Company were having trials made in the Bureau of Engraving and Printing whenever they wanted them tried, and the Bureau gave a good report on it. Van Dyck tried them there. Witness says that he "devised this black"—that is, "I got up this black"—and that he was told what the specifications would be before they were sent out; "that they were going to specify for a black that could be used without admixture; * * * then we changed our match we had for the Wick's black. * * * The Bureau, at that time, was buying the Eddy black, and mixing a black that they got from the Wick's Company which they called the soft black. They were mixing these two before we had the contract, and using it. So we were told that they would use just one black, so we would mix them over here, and that when the specifications came out they would be so worded that that mixture would fill the bill and get the contract. * * * We sent a sample over and had it tested by Mr. Van Dyck out of the same lot that was sent over to him to see whether it was exactly what he expected it to be. This was before we put in the bid." That Van Dyck did not do any chemical work upon the sample that was sent with the Bloede bid for No. 7; that he added some ingredients, etc. Mr. Bloede contradicted this witness in almost every material part of his testimony.

Plaintiff introduced transcript of record from the Supreme Court of the District of Columbia, showing a bill of indictment found January 6, 1908, against E. M. Van Dyck and Victor G. Bloede for violation of the provision of section 5440, Revised Statutes, charging, in the second and third counts, a

conspiracy between said defendants to defraud the United States, in that E. M. Van Dyck, being a chemist and ink maker in the Bureau known as Engraving and Printing, conspired with defendant Bloede to defraud the United States by the means set out in full in the bill of indictment, and being the same matters and things hereinbefore recited. The record shows that defendants, after entering pleas of not guilty, subsequently withdrew said plea, and entered a plea of guilty to the second and third counts. The defendant Van Dyck was adjudged to pay a fine of $10,000, and defendant Bloede a fine of $5,000. Both of said fines were paid.

Both defendants testified that said plea was entered upon the assurance on the part of the District Attorney that their offense was a technical violation of the law involving no moral wrong. At the conclusion of the evidence defendants requested the court to instruct the jury: "That under the pleadings and evidence there is no legally sufficient evidence to show that the Slingluff & Glacken Chemical Company lost any contract, as claimed in the pleadings, by reason of any wrongful, malicious, or unlawful act of the defendants, or either of them, and their verdict shall be for the defendants." The prayer was given as requested, and verdict entered in accordance therewith. Plaintiff duly excepted, and sued out this writ of error.

T Rowland Slingluff and Fielder C. Slingluff, both of Baltimore, Md. (William S. Bryan, Jr., of Baltimore, Md., on the brief), for plaintiff in error.

Robert Biggs and Edgar H. Gans, both of Baltimore, Md., for defendants in error.

Before GOFF and PRITCHARD, Circuit Judges, and CONNOR, District Judge.

CONNOR, District Judge (after stating the facts as above). [1] The learned judge below having overruled a demurrer to the declaration, it must be taken, for the purpose of disposing of the plaintiff's exception, that a cause of action is stated—that is, a wrongful, unlawful invasion of a legal right, resulting in damage. In the light of the testimony and the statement made by the judge, it must be further taken that the plaintiff's right to recover rests upon the sufficiency of the evidence to sustain the fifth count in the declaration. Eliminating all immaterial verbiage, and reducing the pleading to its simplest form, the allegation, in this count, comes to this: The government, acting through one of its agencies, asked for bids or proposals to furnish certain materials described in the specifications, subject to certain provisions and conditions. Pursuant to this request, the Slingluff & Glacken Chemical Company, defendant Bloede Company, and others submitted proposals to furnish such material, accompanied by sample and price. Pursuant to the method prescribed by the government's officers, the Chemical Company's proposal was considered, in connection with others, and upon such consideration the Chemical Company was "about to have a contract awarded to it under which it would, at great profit to itself, have furnished a great quantity of said material"; that it was prevented from having—that is, making—such contract by reason of the malicious, unlawful, and corrupt conduct of the defendants, whereby the said company sustained great damage, etc. The recognition, by the courts, both in England and in this country, of the right of action to the party injured by reason of the malicious and wrongful interference by third persons with contract rights, is well.

settled. The principle is clearly stated by Justice Brewer in Angle v. Chicago, St. Paul, etc., Ry. Co., 151 U. S. 1, 13, 14 Sup. Ct. 240, 245 (38 L. Ed. 55), wherein he says:

"It has been repeatedly held that, if one maliciously interfere in a contract between two parties, and induces one of them to break that contract, to the injury of the other, the party injured can maintain an action against the wrongdoer."

This is but a recognition and application of the principle:

"That whenever a man does an act which, in law and in fact, is a wrongful act, and such an act as may, as a natural and probable consequence of it, produce such an injury, an action on the case will lie."

The principle has been applied to a wrongful, malicious interference with an existing contract in Lumley v. Gye, 2 El. & Bl. 216, Bowen v. Hall, 6 Q. B. D. 333, and other cases cited in the plaintiff's brief. In Quinn v. Leatham, A. C. 495 (1901), Lord Macnaghten says:

"Speaking for myself, I have no hesitation in saying that I think that the decision (Lumley v. Gye) was right, not on the ground of malicious intention—that was not, I think, the gist of the action—but on the ground that a violation of a legal right, committed knowingly, is a cause of action, and that it is a violation of legal right to interfere with contractual relations recognized by law, if there be no sufficient justification for the interference."

Mr. Justice Hughes, in Miles Med. Co. v. Park, 220 U. S. 373, 394, 31 Sup. Ct. 376, 379 (55 L. Ed. 502), recognizes it as "established doctrine that an actionable wrong is committed by one who maliciously interferes with a contract between two parties and induces one of them to break that contract to the injury of the other"—citing Bitterman v. L. & Nashville R. R., 207 U. S. 205, 28 Sup. Ct. 91, 52 L. Ed. 171, 12 Ann. Cas. 693; Walker v. Cronin, 107 Mass. 555; Haskins v. Royster, 70 N. C. 601, 16 Am. Rep. 780; Jones v. Stanly, 76 N. C. 355. In Knickerbocker Ice Co. v. Gardiner, 107 Md. 556, 69 Atl. 405, 16 L. R. A. (N. S.) 746, the question is discussed by Boyd, C. J., and the authorities carefully reviewed.

It having been settled that an action, as for a tort, would lie for a malicious—that is wrongful—interference with the performance of an executory contract, the question naturally arose whether the principle extended to a case in which a third party, with like motive and without lawful excuse, by his interference prevented one from entering into, or making, a contract. The answer to this question is dependent upon the answer to another, which lies at the threshold of the inquiry: Does the right to enter into or make a contract come within the definition of a legal right, the wrongful interference with which is actionable? It is difficult to say, in many cases, at what stage of a negotiation the condition has arisen when it can be said that two persons would, but for the interference of a third party, have entered into contract relations. If A. make a definite proposal to B. to enter into a contract, the character, terms, etc., of which are sufficiently definite to be capable of acceptance, and, while B. is negotiating, or after he has determined to accept the proposal, C. maliciously interferes and prevents the acceptance on the part of B., or procures a withdrawal of the proposi-

tion by A., by reason whereof loss is sustained, can it be said that the party who is injured by such interference has sustained no legal wrong, and that by reason thereof has sustained no injury—that is, loss? Is there not in such case damnum et injuria, which constitute the elements of an actionable wrong? Assuming, pro hac vice, that the facts averred in plaintiff's declaration are true, is it not clear that the Chemical Company, being prepared to comply with the terms of the government's proposal to buy the ink, which was the subject-matter of the proposal, and, accepting the invitation of the government to bid for the contract, by furnishing the sample and stating the price, it secured, over other bidders, a status in the negotiation which, but for defendant's interference, would have resulted in its making the contract by the performance of which it would have made a profit, why did it not have a status, the unlawful interference with which by defendants was a wrong for which he is entitled to a remedy? It is true that the right is more difficult to establish—requiring another link in the process of proof—than where the contract has been entered into. When the parties have entered into a contract, the terms of which are fixed, the plaintiff is only required to show the malicious interference and the damage proximately resulting; whereas, if the ground of complaint is that he was about to make a contract, he is required to go further and show that he was not only "about to," but would, but for the malicious interference of defendants, have entered into the contract, etc. While there are but few adjudged cases throwing light upon the subject, we are not without authority to sustain the ruling of the court below in overruling the demurrer. In Am. & Eng. Enc., vol. 16, page 1114, it is said that:

"According to some authorities, an actionable interference with contract relations is not confined to cases where the contract is binding and valid. It is actionable likewise to maliciously induce the termination of a contract, terminable at will, or to prevent the formation of contracts which, in the natural course and but for such interference, would have been formed."

For this statement of the law the author cites Walker v. Cronin, supra. In that case the declaration alleged that defendant did unlawfully, etc., molest and hinder the plaintiffs from carrying on their business of manufacture and sale of shoes—willfully persuaded a large number of persons who were in the employment of plaintiffs, and others, who were about to enter into their employment, to abandon, etc. It may be suggested that the question presented here did not necessarily arise because the declaration was good without reference to it. The language of Wells, J., however, indicates that he was making no such distinction. After citing authorities, he says:

"In all these cases, the damage for which the recovery is had is, not the loss of the value of actual contracts by reason of their nonfulfillment, but the loss of advantages either of property or personal benefit, which, but for such interference, the plaintiff would have been able to obtain or enjoy."

The language of the judge in Templeton v. Russell, 1 Q. B. 728, clearly indicates that the right of action accrues to the injured party, not only for maliciously "inducing persons to break contracts already

entered into, \* \* \* but for inducing persons not to enter into contracts with the plaintiff"—the reason given being:

"That there was the same wrongful intent in both cases; wrongful, because malicious. There was the same kind of injury to the plaintiff. It seems rather a fine distinction to say that where a defendant maliciously induces a person not to carry out a contract already made with the plaintiff, and so injure the plaintiff, it is actionable, but where he injures the plaintiff, by maliciously preventing a person from entering into a contract which he would otherwise have entered into, it is not actionable."

A careful examination of the facts and of the opinion of Mr. Justice Brewer in Angle v. Chicago, St. Paul, etc., Ry., supra, discloses a number of elements found in this record. Without undertaking to set the facts out in full, they are substantially as follows: A corporation, called in the opinion the Portage Company, had procured a legislative grant for valuable lands, in consideration of its undertaking to construct a railroad. A contract was made with, and was in process of performance by, Angle for the construction of the road. A rival corporation, called in the opinion the Omaha Company, by bribery and other corrupt means, persuaded the Legislature of Wisconsin to repeal the act granting the lands to the Portage Company and grant them to itself, thereby preventing the Portage Company from carrying out its contract with Angle, and thereby inflicting heavy loss upon him. The learned justice says:

"That this was a wrongful interference on the part of the Omaha Company, and that it resulted directly in loss to the contractor and the Portage Company, is apparent. It is not an answer to say that there was no certainty that the contractor would have completed his contract, and so earned these lands for the Portage Company. If such a defense were tolerated, it would always be an answer, in case of any wrongful interference with the performance of a contract, for there is always a lack of certainty. It is enough that there should be, as there was here, a reasonable assurance, considering all the surroundings, that the contract would be performed in the manner and within the time stipulated, and so performed as to secure the land to the company. It certainly does not lie in the mouth of a wrongdoer, in the face of such probabilities as attend this case, to say that perhaps the contract would not have been completed, even if no interference had been had, and that therefore, there being no certainty of the loss, there is no liability."

To the suggestion that the Legislature of Wisconsin had the right and power to revoke the grant, and that, as between it and the Portage Company, it must be conclusively presumed that the Legislature was justified in doing so, that the question of the reason which prompted it to do so was not open to the Portage Company, etc., Judge Brewer says:

"Assuredly it does not lie in the power of the wrongdoer, the party whose wrongs created that condition which induced the legislative forfeiture, to excuse its wrongs on the ground that the Legislature had the power to forfeit, and might have done it any way."

The learned justice cites the cases of Benton v. Pratt, 2 Wend. (N. Y.) 385, 20 Am. Dec. 623, and Rice v. Manley, 66 N. Y. 85, 23 Am. Rep. 30, stating briefly the facts, and saying:

"The point was made that the plaintiff could not recover because there was no binding contract between him and the third parties, but the point was overruled."

After citing other authorities, he says:

"The same line of thought applies to the case before us. While it cannot be affirmed with certainty that the Legislature would not have passed the act of forfeiture, yet it is reasonable to presume that it would not, and that its act was induced by the situation of the Portgage Company, which situation was brought about by the wrongful acts of the Omaha Company."

Assuming that to maliciously prevent the making of a contract is within the same principle, in respect to the remedy, as the interference with the performance of a contract, very much that is said in the Angle Case has a substantial bearing upon the case before us.

[2] In passing upon an exception to an instruction directing a verdict, the evidence is to be considered in the light most favorable to the plaintiff, and, where there is contradiction between witnesses in regard to a material question, it must be taken that the jury would have accepted the testimony of plaintiff's witnesses as true. In other words, a request by the defendant for an instruction directing a verdict is to be tested by the same rules as a demurrer to the evidence. Parks v. Ross, 11 How. 362, 13 L. Ed. 730; Oscanyan v. Arms Co., 103 U. S. 264, 26 L. Ed. 539. We must, therefore, in passing upon the instruction given, take the testimony in the light most favorable to plaintiff, with all such inferences as a jury might reasonably have drawn therefrom.

[3] Considered from this viewpoint, we have this case: Competitive bids were made by the Chemical Company and the defendant Bloede Company to furnish "5 Black No. 1" as described in the specifications. Van Dyck, the ink maker, gave to the Chemical Company's sample the highest rating and reported that the price fixed was the lowest. This report was made to, and accepted by, the Director of the Bureau, with the public statement that the contract would be given to the Chemical Company, with the right reserved to call for a hundred pound sample. This is the uncontradicted testimony. The Chemical Company was ready, willing, and able to comply with this requirement, and to furnish the sample and such guaranty of the ink as might be called for in accordance with its bid. It is testified, without contradiction, that the committee of three appointed "to classify and arrange proposals" was composed of persons who were not chemists, and relied on Van Dyck for all reports in awarding the bids. The rejection of a bid depended upon Van Dyck, and if no report was made the committee "would have to take the lowest bidder." Steinbrenner, a member of the committee, says:

"The committee relied on Mr. Van Dyck for everything in the chemical line in the ink-making division, he being a chemist, and we not being chemists, and he also being a practical ink maker, I understand, and we had to rely upon him for all reports and the awarding of the bids. * * * Have never known the report of the committee to be rejected by the Director of the Bureau."

This witness had been in the Bureau 17 years. The bids were opened May 7, 1901. The committee of three were duly appointed, and, on May 25, 1901, Van Dyck writes to the Director, saying:

"I have made up a Hard Black No. 17 into a note ink, and have completed a very thorough practical press trial, and find it satisfactory in every particular," etc.

On May 27, 1901, he writes:

"Inasmuch as the so-called C. P. Black No. 1 now in use has given considerable trouble during the last year in the working quality of the note and revenue inks, and also has certain properties which tend to make the notes printed with it less desirable than they should be, I respectfully recommend that all bids on this item be rejected, and that the blacks designated as 'Item #6, No. 2,' and 'Item 7, Hard Black' and 'No. 8, Soft Black,' be used during the year beginning July 1, 1901, in such proportion as may best subserve the interest of the Bureau."

These two letters are attached to the report of the committee of three, and "C. P. Black No. 1," for which the Chemical Company had made its bid, and upon which Van Dyck had reported in its favor, and upon which report the Director had stated it would receive the contract, was rejected, and it was stated "the article will not be required"; and, by the same report, "No. 7, Hard Black, Bidder Victor G. Bloede Company, at 45 cents (sample B) accepted." It was also in evidence, uncontradicted, that the approval by the Secretary of the Treasury of the report of the committee of three was a matter of form—that it followed as a matter of course. The first essential step in the proof required that plaintiff should show, or, for the present purpose, introduce, evidence from which, if believed by the jury, it might reasonably be inferred that it was about to make the contract, and would have done so but for the interference of Van Dyck. Does not this undisputed evidence justify the inference that there was a reasonable assurance, considering all the surroundings, that a contract would have been made by the government with the Chemical Company for furnishing the ink—or black—but for the letters of Van Dyck? This was, at least, a question for the jury.

[4] Conceding that the jury may have so found, the plaintiff must go forward with his proof, and show—that is, produce evidence from which the inference might reasonably be drawn—that the interference by Van Dyck was malicious, and that defendant Bloede was a party to, or by corrupt means procured, such interference. It will be well to keep in mind the fact that the word "malicious," used in this connection, does not import personal ill will towards the Chemical Company. If the interference be with the design of injuring the plaintiff, or gaining some advantage at its expense, it is maliciously done. The testimony relating to the conduct of Van Dyck and of Bloede, in connection with the origin and discovery, or invention, of the process for making of "Hard Black 7," is interesting and somewhat contradictory. It seems that the Bloede Company had, for several years, furnished "5 Black No. 1," and that it had proven "unsatisfactory." Whether this was because of the quality of the black furnished by the Bloede Company, or because of some inherent defect in the ink, does not

clearly appear. There is evidence, coming from Van Dyck and Bloede, that experiments had been made, at the request of the Assistant Secretary of the Treasury, by Van Dyck, for the purpose of producing an ink or black to meet the complaints made by the printters of "5 Black No. 1." The evidence in regard to the making up of the specifications for 1901 is contradictory. Van Dyck says that he had nothing to do with it. Ferguson, who made up the specifications, says that he conferred with Van Dyck about getting up these specifications, as well as with other chiefs of division about other kinds of material; that he had no doubt that he conferred with Van Dyck about the forms of specifications of item 5 and item 7 in the specification of 1901—he does not particularly recall about this item; that it was made up at the instigation of Mr. Sullivan, etc. He leaves the question in some confusion.

In view of the fact that the theory upon which plaintiff's case is based, that a conspiracy or agreement existed between Van Dyck and Bloede to prevent the use by the Bureau of No. 5 Black, and supplant it with No. 7 Hard Black, every act of the parties in connection with, or bearing upon, the result which was finally brought about, becomes material. The form of specification was unusual—had not been used before—and while, by itself, of no special significance, when taken in connection with the series of acts and transactions which followed, might very naturally make an impression on the minds of a jury, if they should find that Van Dyck had knowledge of and suggested the language used. The significance of the language of the specification, in view of the fact that it had never been used before, is heightened, if the jury should accept Hopkins' statement that he was told what the specifications would be before they were sent out:

"That they were going to specify for a black that could be used without admixture; * * * that they would use just one black, so we would mix them over here, and when the specifications came out they would be so worded that our mixture would fill the bill and get the contract."

This is denied by Bloede, but its truth was a question for the jury. No sample of No. 7 Hard Black, was sent out with the specification.

In regard to the making of "7 Hard Black," the testimony of Van Dyck and Bloede appears to be, in many material respects, contradictory. Their theory is: That, at the request of the Secretary of the Treasury, Van Dyck made experiments, and that Bloede was, at the same time, carrying on a system of experiments in connection with the Bureau. These experiments resulted in the discovery, or invention, by Van Dyck of an ink which found its way into the specifications for 1901 as "7 Hard Black," etc. That, upon completing the process, Van Dyck wrote a letter to Bloede which is not in evidence. That, in reply to that letter, Bloede wrote Van Dyck February 19, 1901. From this letter it is manifest that negotiations had theretofore been had between the parties and that there was "a difference in their views." The question of "policy or morals" was raised by Bloede, with the suggestion that Van Dyck procure the consent of Mr. Vanderlip to the proposed transaction. On February 20, 1901, Van Dyck writes Bloede:

"I am very glad to state that Secretary Gage, in the presence of Mr. Vanderlip, and myself, ruled that I had a perfect right to dispose of the 'products of my brains' (to quote Secretary Gage exactly) at any price which I might be able to secure, so long as I was not competing with the government or injuring its cause in any way," etc.

This correspondence resulted in the contract of March 14, 1901, by which Van Dyck was to receive $25,000 for his process—$1,000 of which was to be paid in cash and the balance in two-thirds of the net proceeds of the sale, until the full amount was paid. It will be noted that, in this contract, the following provision was made:

"Should, however, the said process be found impracticable or commercially disadvantageous, it is agreed that the said Bloede may, at any time, discontinue the use thereof, and that, in such case, all liability on the part of Bloede for any part of said sum of twenty-four thousand dollars, then unpaid, shall at once cease and terminate."

Taking the testimony of Van Dyck and Bloede as true, this contract is very far removed from the permission given by Secretary Gage to "sell the products of his brain," etc. What other construction can be put upon this transaction than that, from and after March 14, 1901, Van Dyck, the chemist and ink maker in the employment of the government, with the duty imposed upon him described by the witnesses, was vitally interested to the extent of $24,000 in having the bids for "5 Black" rejected and "7 Hard Black" accepted—the latter to displace the former? Does not this testimony justify a reasonable inference by a jury that, after having given to the sample of the Chemical Company the highest rating and reported its bid, the lowest price (unknown to him that the sample and bid were those of the Chemical Company), the success of his enterprise, or making the process "commercially advantageous," was dependent upon having "5 Black" rejected and "7 Hard Black" accepted? Is it not a fair inference that this condition explains Van Dyck's motive for writing the letters of May 25 and May 27, 1901, which brought about the "desired result"?

There is, however, another version of this transaction by a disinterested witness. The theory of defendants is that Van Dyck had discovered a new and valuable process, known only to himself, worth, if commercially advantageous, $25,000 to the bidder for the contract. Hopkins testifies that, while in the employment of the Bloede Company, as its chemist, he was directed to make experiments upon "blacks" for the purpose of meeting the wishes of the Bureau; that he "devised the formula"; that he, with knowledge of what would be called for, "delivered the formula, and did pretty much all the work that was done on it; that Van Dyck did absolutely none of the chemical work upon the sample that was sent him with the Bloede bid for No. 7." The testimony of this witness is contradicted by Bloede and Van Dyck. If, however, the jury should accept it as true, the entire transaction assumes a different aspect from that presented by defendants. Van Dyck had nothing to sell. Knowing that the Black No. 5 made and furnished to the government by Bloede had "proven unsatisfactory," and that it

was desired that some other ink be used, Van Dyck proceeds to have a specification made in advance. This is given Bloede's chemist, with instruction to experiment on it. The result is accomplished by the chemist. It is desirable to attribute the discovery to Van Dyck, to interest him in securing its adoption in place of No. 5, and for his service to pay him $25,000, provided it proves commercially advantageous. The desired result is brought about by the "interference of Van Dyck." "No. 5," notwithstanding it has the highest rating and is offered at 29 cents per pound, is "rejected," and "No. 7," which costs less to make, is "accepted" at 45 cents per pound, and Van Dyck, under a contract with Bloede, differing only from the contract of March 14, 1901, in method of payment, receives $25,000. This is plaintiff's theory, which he claims is sustained by the evidence. We express no opinion, nor make any intimation in regard to the weight of the conflicting evidence. That was a question for the jury. They may have accepted Hopkins' testimony as true. If Hopkins' testimony is true, Van Dyck had no "product of his brain" to sell. The agreement on the part of Bloede to pay him $25,000 could have had no other consideration than that he should use his official power to secure the contract for "No. 7, Hard Black." After "No. 5" had, by a competitive bid, secured a status from which, in the light of surrounding circumstances and conditions, a reasonable inference may be drawn that, but for the interference of Van Dyck, induced by the promise of Bloede to pay him $24,000 for doing so, a contract would have been made by the government with the Chemical Company. Van Dyck practically instructed the committee of three to reject No. 5.

We concur with counsel that the plea of guilty to the indictment, entered by defendants, was not an admission that they were engaged in a conspiracy to injure the Chemical Company. The plea was an admission that, in securing the contract for No. 7, Hard Black, Van Dyck was not acting in good faith and with the purpose of serving the government, but that his real purpose was to defraud—that is, make a profit out of, and at the expense of—the government, and that Bloede was a party to such scheme. The value to be attached to the explanation of the reason for entering the plea is lowered by more than one pregnant fact and circumstance. The record shows that they were represented by counsel. If this explanation, etc., is rejected by the jury, the admission of record, that they were engaged in a conspiracy to defraud the government, and that its success was concealed until discovered after eight years' investigation by the agents of the secret service of the government, it might very well have impressed their minds and caused them to hesitate in accepting defendants' version of the transaction as it affected the Chemical Company. Notwithstanding their contention that they were only seeking to promote the interest of the government in a plan by which the article of the highest rating at the lowest bid was rejected, and the process of defendants was accepted, to the great profit of Van Dyck and Bloede, the jury might well find that the real motive of Van Dyck, in writing

the letter of May 27, 1911, was to injure the Chemical Company and to make a profit for himself; and this, the law declares, was a malicious, unlawful, and wrongful interference with a right of the Chemical Company. We are not inadvertent to the principle, sustained and illustrated by numerous cases, that fair competition in trade, although resulting in loss to the injured party, does not give a right of action. It is equally well settled that, if unlawful methods are resorted to, and the motive to injure be shown, it is an actionable wrong. It will hardly be contended that the means charged to accomplish the wrong, prompted by the motive charged, brings the conduct of defendants within the domain of fair competition for trade.

Defendants earnestly insist that, if all of this be conceded, yet the instruction was correct, because the Chemical Company had no property interest, or legal right, to demand of the government that, after submitting its bid and sample securing the rating, it make a contract for the ink. Colorado Paving Co. v. Murphy, 78 Fed. 28, 23 C. C. A. 631, 37 L. R. A. 630, is cited. There the appellee, the lowest bidder for certain paving material, sought to enjoin the board of public works from giving the contract to a higher bidder. The bill charged a conspiracy, etc. The court properly held that it could grant no relief, because the plaintiff had acquired no legal right to demand that the contract be awarded to it, which a court of equity would enforce. The principle involved here is clearly distinguishable. The gravamen of this action is that defendants, by a malicious interference, deprived the Chemical Company of the opportunity to enter into a contract under the conditions shown by the evidence. As we have seen, the authorities uniformly hold that, when the action is for malicious interference with a contract, the guilty party will not be heard to say that the contract interfered with was invalid and not enforceable. The question in such case is: Does the evidence tend to show that "in the natural course, and but for such interference, the contract would have been formed"? The basis of the action is "for maliciously preventing a person from entering into a contract which he would otherwise have entered into." Adapting the language of Judge Brewer to the testimony in this case, it is no answer to plaintiff's complaint to say that there was no certainty that the contract would have been made. If such a defense were tolerated, it would always be an answer, in case of any wrongful interference with the making of a contract, for there is always a lack of certainty. It is enough to show that there is a reasonable assurance, considering all the circumstances, that a contract would have been made. It is, of course, conceded that the plaintiff must show, not only damnum, but also injuria. To show the former without the latter is damnum absque injuria, and therefore not a remediable wrong.

The defendants contend, and the learned judge concurred with them, that the evidence failed to show that, if the defendants had not interfered, the Chemical Company would have received the contract, and that the evidence in that respect was uncontradicted.

If, however, the evidence would have reasonably sustained an inference or conclusion to the contrary, or if, in the language of the courts in numerous cases, fair-minded men of intelligence may have drawn different conclusions from the evidence, the question was for the jury, and not for the court. In such cases, the jury are entitled, not only to weigh the testimony, but to draw reasonable inferences from it. With deference to the learned judge, we think that such was the state of the case upon all of the evidence. It is true that in certain phases the evidence was of such character as to leave the question open to debate, and reasonably calculated to sustain a conclusion favorable to defendants' view; but this is not the standard by which the power of the court to direct a verdict is measured. The persons in charge of the Bureau had not determined to reject "5 Black No. 1," nor to adopt "7 Hard Black" for 1901–02, although they had the same information in regard to the merits of each at the time the specifications were made as at the time Van Dyck wrote the letter to the "committee of three." It will be noted, also, that, in estimating the requisition for "5 No. 1, Hard Black," the amount was put at 75,000 pounds, whereas, for "7 Hard Black," only 1,000 pounds would be required. This certainly falls far short of showing a prior determination to "reject all bids" for "5 Hard Black." It is hardly consistent with fair business methods to attribute to the officers in charge of Bureau a purpose, when the specifications were drawn, to trifle with the bidders for "5 Hard Black." That it had not given satisfaction may be conceded, and that, if "7 Hard Black" was found to meet the difficulty, it is probable that this would have supplanted the other. It is significant that, after the specifications were drawn in the usual form, the language relied upon by defendants to defeat the action, was added. If this entire transaction from "start to finish" is open, fair, and free from moral wrong, then many of the badges to the contrary are of no import.

If the jury should find for plaintiff, it may be conceded that it will be difficult to fix the amount of the loss sustained by the Chemical Company; but that it did sustain loss reasonably follows from the undisputed testimony. We express no opinion in regard to the measure of damages which should guide the jury. The question is not free from difficulty. We have discussed the evidence, as we are required to do upon this record, from the same point of view that the court below did in directing a verdict, and are brought to the conclusion that the plaintiff was entitled to have his case passed upon by the jury. This will be certified to the court below.

Reversed.